UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ASIA ECONOMIC INSTITUTE, a California limited liability company, RAYMOND MOBREZ, an individual, and ILIANA LLANERAS, an individual, | ) ) ) ) ) ) | CV 10-1360 SVW (PJWx) |
| Plaintiffs, | ) ) | ORDER DENYING DEFENDANTS' |
| v. | ) ) | MOTION TO STRIKE UNDER THE CALIFORNIA ANTI-SLAPP STATUTE |
| XCENTRIC VENTURES, LLC, an Arizona limited liability company, d/b/a/ as BADBUSINESS BUREAU and/or BADBUSINESSBUREAU.COM, and/or RIP OFF REPORT and/or RIPOFF REPORT.COM; BAD BUSINESS BUREAU, LLC, organized and existing under the laws of St. Kitts/Nevis, West Indies; EDWARD MAGEDSON, an individual, and DOES 1 through 100, inclusive, | ) ) ) ) | AND DENYING DEFENDANTS' REQUEST FOR A RICO CASE STATEMENT [9] |
| Defendants. | | |

## I.   Introduction

Plaintiffs Asia Economic Institute, LLC ("AEI") and its

principals, Raymond Mobrez and Iliana Llaneras (collectively,

"Plaintiffs" or "AEI") brought this action on January 27, 2010.  The

case was removed to this Court in February 2010.  Plaintiffs generally allege that Defendant Xcentric Ventures, LLC ("Xcentric") operates a website, www.RipoffReport.com ("Ripoff Report"), and that defamatory comments regarding AEI and its principals were posted on the website by third parties.  Plaintiffs assert several claims against Xcentric arising out of these posts (and Defendants' conduct related thereto) including defamation, unfair business practices, intentional and negligent interference with prospective economic advantage, and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

On March 22, 2010, Defendants Xcentric and its founder, Ed Magedson ("Magedson"), brought the present Special Motion to Strike the Complaint under the anti-SLAPP statute, California Civil Code § 425.16. Defendants seek to dismiss the defamation-related causes of action, arguing that such claims arise out of protected speech under Section 425.16(e).  Defendants note that the RICO claims, which are predicated on certain communications between Magedson and Mobrez that Plaintiffs allege constitute extortion, are arguably are not based on "protected conduct" within the meaning of Section 425.16.  Thus, the RICO claims are not part of Defendants' Motion to Strike.

Additionally, Defendants request that the Court order Plaintiffs to fill out a RICO Case Statement, so as to clarify the RICO claims.

For the reasons stated below, Defendants' Special Motion to Strike is DENIED.  The Court also DENIES Defendants' request for a RICO Case Statement.

///

///

## II.   Facts and Procedural Background

### A.   Asia Economic Institute ("AEI")

Plaintiff AEI has conducted business in California for the past nine years.  AEI operates as a free on-line, non-governmental publication of current economic news and events.  AEI does not sell products nor are they engaged in marketing.  AEI is operated by its principals, Plaintiffs Mobrez and Llaneras.  At the time of the events giving rise to this Complaint, AEI was a small, virtually unknown company that employed approximately 10 persons, including Mobrez and Llaneras.

### B.   Xcentric and www.RipoffReport.com

Defendant Xcentric operates a website at www.RipoffReport.com ("Ripoff Report"), which started in 1998.  Ed Magedson ("Magedson") is the founder and manager of Xcentric and the "ED"itor of the website. Ripoff Report allows third-parties to post reports regarding the business practices (among other things) of persons or companies.  The posting service is free, and third-parties can also post comments about the reports.  Magedson contends that "the Ripoff Report is the leading complaint reporting website on the Internet . . . ." (Magedson Decl. ¶ 2.)  As of March 2010, the Ripoff Report website contains more than 500,000 unique reports.  (Id. ¶ 5.)  Every user-generated report is screened and reviewed by Xcentric staff members, who are authorized to make minor non-substantive editorial changes to the reports, including the removal of offensive language, profanity, racial comments, threats of violence, and certain types of personal information such as social security numbers, bank account numbers, and so forth.  (Id. ¶ 6.)

When someone posts a negative report on Ripoff Report, the subject of the complaint has various options for dealing with the negative report.  First, the subject may post free "rebuttals" or comments to the third-party reports explaining its side of the story. Additionally, a company or individual can deal with negative reports by joining Ripoff Report's Corporate Advocacy Program ("CAP").  Magedson describes the CAP program as follows: The purpose of the program is "to ensure that complaints submitted by unhappy customers are resolved and that the root problems which caused these complaints are fixed so that future complaints can be reduced or avoided."  (Magedson Decl. ¶ 15.) A company who joins the CAP program is required to state in writing that it will work with Ripoff Report and the complainants to resolve the complaints.  (<u>Id.</u> ¶¶ 15-16.)  The company is required to accept some level of responsibility for customer complaints even if it does not agree with them.  This **<u>must</u>** include offering a full refund if requested by the complaining customers.  (<u>Id.</u> ¶ 16.)  In exchange, Ripoff Report agrees to act as a liaison between the CAP member and the complainants by contacting each author who has submitted a report and informing them that the company has joined CAP and is committed to resolving the complaints.  (<u>Id.</u> ¶ 17.)  If the complaint is resolved, Ripoff Report asks the complainant to post an update to his or her report so that readers can see that the matter has been addressed. (<u>Id.</u>)  Further, regardless of the resolution of the complaint, when a company joins the CAP program, Ripoff Report posts information explaining this fact as an introduction to each report about the company on the website.

The reports posted by third-parties are **never** removed from the website.  This is true regardless of whether a company or individual joins the CAP program – in other words, membership in the program **never** results in a report being removed.   Ripoff Report will not remove a complaint in the exchange for money.   That said, joining the CAP program does require the payment of a fee, although the amount of the fee is not clear.

### C.    Reports About AEI

On or about February 2009, Plaintiffs Mobrez and Llaneras conducted a search on Google.com for Internet sources referring to the terms "Raymond Mobrez," "Mobrez," "Iliana Llaneras," "Llaneras," and "AEI."  Plaintiffs discovered that there were four reports about AEI, Mobrez, and/or Llaneras posted on the Ripoff Report website.  To date, there are six reports regarding Plaintiffs on Defendant's website.  Generally, the reports are written by former employees of AEI contending that AEI is a bad place to work.  Among other things, the reports state the following: "They reduce pay illegally;" "Complete disorganization;" "[T]hey have no idea to [sic] run any business and just continue to ruin people's lives . . .;" "[O]nce you start working, nothing ever gets done. . . . There are a couple of theories that could explain this paradox.   One is that they are laundering money . . .;" "They treat their employees like dirt;" "Asia Economic Institute it's a SCAM;" and "They routinely ignore employment laws."   (Magedson Decl., Exhs. F-I.)  The reports also call into question whether Mobrez's stated credentials are accurate and state that Mobrez hires and fires on the basis of race, religion and gender.  (Id.)  Other more innocuous comments include that Mobrez and Llaneras are "boring," "crazy," and

"secretly married."  (Id.)

    It appears that the reports have had some effect on AEI's
business.  For example, one comment about AEI was posted by a person
who had purportedly interviewed for a job with AEI and was offered a
position, but upon reading the reports on RipoffReport.com, decided not
to accept the position.  (Magedson Decl., Exh. I.)

    D.    **Communications Between the Parties**

    On May 5, 2009, Plaintiff Mobrez sent an email to Magedson asking
for his assistance in removing the unflattering posts regarding AEI
from the Ripoff Report website.  (Mobrez Decl. Exh. C.)  Mobrez
contends that shortly thereafter, he contacted Magedson via telephone
and told him that the posts were untrue and that Mobrez could prove it.
Magedson was not responsive.  (Id. ¶ 5.)   On May 12, 2009, Magedson
sent Mobrez an email responding to his request that the posts be
removed from the website.  The email was in the form a "form response"
to common requests.  (Magedson Decl., Exh. B.)  In the email, Magedson
provided a lengthy explanation of the Ripoff Report website, including
answers to various frequently asked questions about the website.   The
email also contained information about filing a free rebuttal to a
negative report and general information about the CAP  program.  (Id.)
After sending the email, Magedson received a call from Mobrez inquiring
about the CAP program.  (Id. ¶ 28.)  Mobrez contends that Magedson
offered to enroll AEI in the CAP program for a fee of at least $5,000,
plus a monthly monitoring fee.  (Mobrez Decl. ¶ 7.)   Magedson told
Mobrez that inquires about the CAP program must be done in writing and
directed Mobrez to the CAP application form available on the website.
(Magedson Decl., Exh. C.)

On July 24, 2009, Mobrez again contacted Magedson via email and told him that AEI could not complete the CAP Application Form because it required AEI to stipulate to things that they did not do, and AEI was not willing to admit responsibility for acts described in the former employees' reports. (Magedson Decl., Exh. D.)  Mobrez also indicated that he would like to meet with Magedson in person to try and resolve the matter. (Id.)  In response, Magedson wrote to Mobrez on the same day stating that a meeting in person would not be necessary because there was nothing Magedson could do. (Magedson Decl., Exh. E.) Magedson explained that Xcentric never removes reports from the Ripoff Report website, and would not do so even if a large sum of money were offered. (Id.)  Magedson encouraged Mobrez to file a free rebuttal to the report. (Id.)

The July 24, 2009 email chain was the last contact between Plaintiffs and Defendants prior to the filing of this lawsuit.  As far as the Court is aware, the six reports regarding Plaintiffs are still posted on the Ripoff Report website.

On January 27, 2010, Plaintiffs filed this action against Defendants in Los Angeles Superior Court.  The action was subsequently removed to this Court in February 2010.  Plaintiff alleges the following claims against Xcentric and Magedson: (1) common law defamation; (2) unfair business practices in violation of California Business and Professions Code § 17200 et. seq.; (3) violation of 18 U.S.C. § 1962(c), RICO, based on the predicate act of extortion; (4) violation of 18 U.S.C. § 1962(d), RICO, based on the predicate act of extortion; (5) civil conspiracy based upon the alleged solicitation, development and publication of defamatory posts; (6) defamation per se;

(7) false light; (8) intentional interference with prospective economic

relations; (9) negligent interference with prospective economic

relations; (10) inducing breach of contract; (11) preliminary

injunction; and (12) permanent injunction.

In this Motion, Defendant seeks an order dismissing the First and

Second, and Fifth through Tenth causes of action under the anti-SLAPP

statute, California Code of Civil Procedure § 425.16. The RICO claims

are not at issue in this motion.

**III. Motion to Strike Under California Civil Code § 425.16**

**A.    Legal Standard**

California's anti-SLAPP statue protects against lawsuits arising

out of "any act . . . in furtherance of [one's] right of petition or

free speech under the United States Constitution or the California

Constitution in connection with a public issue." Cal. Civ. Code

§ 425.16(b)(1). The statute provides for a motion to strike a

complaint so as "to allow early dismissal of meritless first amendment

cases aimed at chilling expression through costly, time-consuming

litigation." Metabolife Intern., Inc. v. Wormick, 264 F.3d 832, 839

(9th Cir. 2001). California anti-SLAPP motions to strike (and for

motions for attorneys' fees) are available to litigants proceeding in

federal court. Thomas v. Fry's Electronics, Inc., 400 F.3d 1206 (9th

Cir. 2005); Batzel v. Smith, 333 F.3d 1018, 1025-26 (9th Cir. 2003)

("[T]he protection of the anti-SLAPP statute [acts] as a substantive

immunity from suit.")

When considering a motion to strike under the anti-SLAPP statute,

the court must perform a two-step analysis. First, the defendant must

make a threshold showing that the challenged cause of action is one

arising from protected activity as defined in section 425.16.[1]
Kronemyer v. Internet Movie Data Base, Inc., 150 Cal. App. 4th 941, 946
(Ct. App. 2007).  This showing is met by demonstrating that the act
underlying plaintiff's cause of action fits one of the categories
spelled out in section 425.16, subdivision (e).  City of Cotati v.
Cashman, 29 Cal. 4th 69, 78 (2002).  Relevant to the current lawsuit,
subdivision (e) of section 425.16 includes the following:

> (3) any written or oral statement or writing made in a place
> open to the public or a public forum in connection with an
> issue of public interest;
>
> (4) or any other conduct in furtherance of the exercise of
> constitutional right of petition or the constitutional right
> of free speech in connection with a public issue or an issue
> of public interest.

Cal. Code Civ. Proc. § 425.16(e)(3) and (4).  If, and only if, the
defendant can show that the claims at issue arise from one of these
categories, the defendant has met the first step.  See Hilton v.
Hallmark Cards, 580 F.3d 874, 882 (9th Cir. 2009) ("If the first
question is answered in the negative, then the motion must fail, even
if the plaintiff stated no cognizable claim."); Commonwealth Energy
Corp. v. Investor Data Exchange, Inc., 110 Cal. App. 4th 26, 32 (Ct.
App. 2003) ("[I]f the moving defendant cannot meet the *threshold*
showing, then the fact that he or she might be able to otherwise
prevail on the merits under the [second] step is irrelevant.")
(emphasis in original).

    Once the defendant establishes that the anti-SLAPP statute
applies, the burden shifts to the plaintiff to establish "a probability
that the plaintiff will prevail on the claim."  Church of Scientology

---

[1] All future section references are to the California Civil Code unless
otherwise noted.

9

v. Wollersheim, 42 Cal. App. 4th 628, 646 (Ct. App. 1996), *disapproved in part on other grounds*, Equilon Enters. v. Consumer Cause, Inc., 29 Cal. 4th 53, 68 n.5 (2002).   To meet this burden, the "plaintiff [is] required both to plead claims that [are] legally sufficient, and to make a prima facie showing, by admissible evidence, of facts that would merit a favorable judgment on those claims, assuming plaintiff's evidence [is] credited."   1-800 Contracts, Inc. v. Steinberg, 107 Cal. App. 4th 568, 584 (Ct. App. 2003) (citing Wilson v. Parker, Covert & Chidester, 28 Cal. 4th 811, 821 (2002), Wilcox v. Superior Court, 27 Cal. App. 4th 809, 823-24, 830 (Ct. App. 1994), and Evans v. Unkow, 38 Cal. App. 4th 1490, 1497-98 (Ct. App. 1995)).   The court may not weigh evidence, but instead must determine whether plaintiff's evidence would, if credited, be sufficient to meet the burden of proof for the claim.   McGarry v. University of San Diego, 154 Cal. App. 4th 97, 108 (Ct. App. 2007).   The court must consider the pleadings and any supporting and opposing affidavits stating the facts upon which the liability is based.   Cal. Code Civ. Proc. § 425.16(b)(2).   The court must also examine the defenses to the pleaded claims and whether there is any evidence to negate such defenses.   McGarry, 154 Cal. App. 4th at 108.   The plaintiff's burden on an anti-SLAPP motion has often been described as akin to the burden in opposing summary judgment.   1-800 Contracts, Inc., 107 Cal. App. 4th at 584.

**B.   First Step: Whether the Anti-SLAPP Statute Applies**

Defendants contend that both subsection (e)(3) and (e)(4) of section 425.16 apply to the claims at issue in this motion to strike. Specifically, Defendants argue that subsection (e)(3) applies to the reports and comments posted by third-party users on the Ripoff Report

website, and that subsection (e)(4) applies to the speech and conduct
of Magedson and the Ripoff Report, apart from anything written by
Ripoff Report's users.  (Mot. at 6.)

Subsection (e)(3) requires that a written or oral statement be
made in a "place open to the public or a public forum."  Websites
accessible to the public, such as www.RipoffReport.com, are "public
forums" for purposes of the anti-SLAPP statute.  Barrett v. Rosenthal,
40 Cal. 4th 33, 41, n.4 (2006) (citing extensive authority for the
premise); Kronemyer v. Internet Movie Data Base, Inc., 150 Cal. App.
4th 941, 950 (2007) ("We are satisfied that respondent's website
constitutes a public forum."); Global Telemedia Int'l, Inc. v. Doe 1,
132 F. Supp. 2d 1261, 1264 (C.D. Cal. 2001) (statements posted on an
Internet message board were made in a public place or public forum
within the meaning of Section 425.16(e)).  Thus, this requirement of
subsection (e)(3) is met.

Additionally, both subsection (e)(3) and (e)(4) require that the
speech or conduct be related to issues of public interest.  The parties
vigorously dispute whether the speech posted on Ripoff Report concerns
an issue of public interest.

### 1.    Whether the Reports Involve Public Issues Under California Civil Code § 425.16(e)(3)

The requirement that speech implicate an issue of public interest[2]
is "intended . . . to have a limiting effect on the types of conduct
that come within the third and fourth categories of the statute."
Weinberg v. Feisel, 110 Cal. App. 4th 1122, 1132 (Ct. App. 2003).

---

[2] Although subsection (e)(4) uses the term "public issue" or "issue of public interest" disjunctively, there appears to be no substantive difference between them.  WEIL, BROWN, & RYLAARSDAM, CALIFORNIA PRACTICE GUIDE: CIVIL PROCEDURE BEFORE TRIAL § 7:780 (Rutter Group 2009).

Nonetheless, the "public interest" requirement is broadly construed to include "not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." Damon v. Ocean Hills Journalism Club, 85 Cal. App. 4th 468, 479 (2000) (statements criticizing the manager of a homeowners' association governing 3,000 individuals and 1,633 homes concerned the manner in which a large residential community would be governed; thus, the statements related to an issue of public interest); see e.g., Church of Scientology of California, 42 Cal. App. 4th at 650 (the Church of Scientology was a matter of public interest because of the amount of media coverage the Church received and the extent of its membership and assets); Global Telemedia Int'l, Inc. v. Doe 1, 132 F. Supp. 2d 1261, 1264 (C.D. Cal. 2001) (statements regarding a publicly-traded company that thrust itself in the public eye through numerous press releases and had over 18,000 shareholders were matters of public interest).

Although the statute does not define "an issue of public interest," cases in which the requirement is met generally fall within at least one of the following three categories:

(1) statements concerning a person or entity in the public eye (see Sipple v. Foundation for Nat'l Progress, 71 Cal. App. 4th 226 (Ct. App. 1999) [statements that a political consultant had abused his spouse, where consultant had made the prevention of domestic violence a cornerstone of his advertising campaigns]; Seelig v. Infinity Broadcasting Corp., 97 Cal. App. 4th 798 (Ct. App. 2002)

  
[statements regarding a contestant on a nationally-broadcast and
controversial reality television show]);

(2) conduct that could directly affect a large number of people
beyond the direct participants (see Damon, 85 Cal. App. 4th 468
[discussed above]; Church of Scientology, 42 Cal. App. 4th at 650-
51 [discussed above]; Ludwig v. Superior Court, 37 Cal. App. 4th 8
(Ct. App. 1995) [development of a mall with potential
environmental effects on the community, such as increased
traffic]), or;

(3) a topic of widespread public interest (see Terry v. Davis
Community Church, 131 Cal. App. 4th 1534 (Ct. App. 2005)
[statements that church youth group leaders had sexual relations
with minors implicated the societal interest in protecting
children from predators]; M.G. v. Time Warner, Inc., 89 Cal. App.
4th 623 (Ct. App. 2001) [*Sports Illustrated* cover story regarding
incidents of child molestation in youth sports implicated public
interest]; McGarry v. University of San Diego, 154 Cal. App. 4th
97 (2007) [termination of university football coach for the past
26 years was a matter of widespread public interest, and coach was
a limited public figure]).

Further, the extent of publication is not relevant to whether the issue
is one of public interest.  That is, a person "cannot turn otherwise
private information into a matter of public interest simply by
communicating it to a large number of people."  Weinberg, 110 Cal. App.

4th at 1133; Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO, 105 Cal. App. 4th 913, 926 (Ct. App. 2003); WEIL, BROWN, & RYLAARSDAM, CALIFORNIA PRACTICE GUIDE: CIVIL PROCEDURE BEFORE TRIAL § 7:784 (Rutter Group 2009).

California courts have routinely held that "a matter of concern [only] to the speaker and a relatively small, specific audience is not a matter of public interest." Weinberg, 110 Cal. App. 4th at 1132; see e.g., Du Charme v. Int'l Brotherhood of Electrical Workers, Local 45, 110 Cal. App. 4th 107, 118-19 (Ct. App. 2003). Weinberg v. Feisel nicely illustrates this point. In Weinberg, plaintiff and defendant were both aficionados of token collecting and belonged to the National Token Collectors' Association ("NTCA"). Id. at 1127. At the relevant time, the NTCA had approximately 700 members and published a monthly newsletter for such members. Id. In 1998 or 1999, both plaintiff and defendant attended a token show where collectors exhibited their collections. One of defendant's tokens went missing at the show, and he accused plaintiff of stealing it. Id. Thereafter, defendant published an advertisement in the NTCA monthly newsletter and personally sent letters to over 20 token collectors accusing plaintiff of the theft. Id. at 1128. Plaintiff filed a defamation suit, and defendant brought a motion to strike under section 425.16.

The Weinberg court held that defendant's advertisements and letters did not concern matters of public interest within the meaning of the anti-SLAPP statute. Id. at 1134. After surveying numerous cases on the issue of public interest, the court reasoned, "[the] defendant did not present any evidence to show that plaintiff was anything other than a private, anonymous token collector; that their

dispute was anything other than a private controversy; or that the communications were made to anyone other than a small group of other private parties." Id. at 1132. In short, plaintiff was not a public figure and the statements were only of interest to a narrow group of at most 700 token collectors. The court concluded, "private communications about private matters . . . warrant no special protection" under the anti-SLAPP statute. Id. at 1132.

The Weinberg court also rejected the defendant's argument that his statements concerned the public interest because they accused plaintiff of criminal acts. Id. at 1134-35. The court held that while accusations of criminal conduct may be protected when one attempts to expose wrongdoing to the authorities or initiate civil proceedings, the mere fact that defendant's statements accuse plaintiff of criminal conduct "does not automatically make them a matter of public interest." Id. at 1135. In Weinberg, defendant did not report his suspicions to law enforcement, no criminal charges or investigations were pending, and there was no evidence that he had initiated civil proceedings against plaintiff. Id. at 1135. Under those circumstances, the accusations were not a matter of public interest.

In Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO, 105 Cal. App. 4th 913 (Ct. App. 2003), a case closely analogous to the present case, the court addressed whether a private employment dispute could be a matter of public interest. There, the plaintiff, David Rivero, was a supervisor of eight janitors at the International House on the campus of the University of California at Berkeley. Id. at 916. The janitors supervised by Rivero were members of the defendant labor union ("the Union"). Id. The

15

janitors made allegations of misconduct against Rivero, which were not substantiated.   Nonetheless, Rivero was demoted, and then fired when he would not accept the demotion.   Id.   After Rivero's termination, the Union published and distributed three documents to union members which heralded Rivero's termination and accused Rivero of soliciting bribes, hiring family members, and abusing or mistreating the eight janitors who worked for him.   Id. at 917.   Rivero sued the Union for defamation.

The Union argued that its statements involved matters of public interest because "abusive supervision of employees throughout the University of California system" impacts a community of 17,000 public employees, and unlawful workplace activity is a matter of particular interest when it occurs at a publicly-financed institution.   Id. at 919.   The California Court of Appeals flatly disagreed.   The court explained:

> Here, the Union's statements concerned the supervision of a staff of eight custodians by Rivero, an individual who had previously received no public attention or media coverage. Moreover, the only individuals directly involved and affected by the situation were Rivero and the eight custodians. Rivero's supervision of those eight individuals is hardly a matter of public interest.

Id. at 924.   The court also rejected the Union's claim that, because public policy favors criticism of unlawful workplace activity, such issues are always a matter of public interest.   Id. at 925.   The court noted that, were the Union's argument accepted, nearly every workplace dispute would qualify as a matter of public interest.   Id.   Finding this conclusion far too sweeping, the court held that, "unlawful workplace activity below some threshold level of significance is not an

1    issue of public interest, even though it implicates a public policy."

2    Id.[3]

3        The court reached a similar conclusion in Olaes v. Nationwide

4    Mutual Insurance Co., 135 Cal. App. 4th 1501 (2006).  In Olaes, the

5    plaintiff was discharged from employment with the defendant after two

6    employees complained that he had sexually harassed them.  Id. at 1504.

7    The plaintiff later filed a defamation complaint against defendant,

8    claiming that defendant falsely accused him of harassment and failed to

9    investigate the charges against him.  Id.  In response, defendant

10   brought a motion to strike under Section 425.16.

11       The court held that the defendant's conduct did not meet the

12   public interest requirement of subdivision (e).  Id. at 1510.  As in

13   Rivero, the statements concerned an individual who was not in the

14   public eye, and directly impacted only a few individuals.  See id. at

15   1511.  While recognizing the "[undeniable] public interest in the fair

16   resolution of claims of sexual harassment," the court held that "this

17   general public interest does not bring [plaintiff's] complaint . . .

18   into section 425.16's ambit."  Id.  Citing to Weinberg and Rivero, the

19   court held that "a dispute among a small number of people in a

20   workplace does not implicate a broader public interest subject to a

21   motion to strike under section 425.16, subdivision (e)."  Id.

22       Finally, in Du Charme v. Int'l Brotherhood of Electrical Workers,

23   Local 45, 110 Cal. App. 4th 107, 118-19 (Ct. App. 2003), the California

24   Court of Appeals again addressed the public interest requirement in the

25

26   [3] Specifically, Rivero was accused of hiring family members, offering to
     nominate an employee for a $2,500 service award in exchange for a share of the
     award, letting a custodian sleep on the job, and extorting or borrowing
27   $10,000 from another custodian.  The court found that this misconduct did not
     rise to the level of public interest.  Rivero, 105 Cal. App. 4th at 925.

28

context of a workplace dispute.   In <u>Du Charme</u>, plaintiff was an
assistant business manager of a labor union.   <u>Id.</u> at 113.   Plaintiff's
supervisor was terminated for embezzlement of union funds, and shortly
thereafter, plaintiff was terminated for taking unauthorized vacation
and overtime pay.   <u>Id.</u>  The union then posted a statement on its
Internet website stating that plaintiff had been removed from office
for "fiscal mismanagement."   <u>Id.</u> at 114.   Plaintiff sued the union for
defamation.   <u>Id.</u>

The <u>Du Charme</u> court held that the union's statement was not
protected by the anti-SLAPP statute as a statement made in connection
with a matter of public interest.   Specifically, the court noted that
the statement was presumably of interest only to the union membership,
which was a limited but definable community.   <u>Id.</u> at 118.
Additionally, the statement did not concern any ongoing debate or
controversy requiring participation by the union members – for example,
a vote on a particular issue or the future management of the union.
<u>Id.</u>  Rather, the statement simply informed members of plaintiff's
termination.   In light of these facts, the court held that "where the
issue is not of interest to the public at large, but rather to a
limited, but definable portion of the public . . . the constitutionally
protected activity must, at a minimum, occur in the context of an
ongoing controversy . . . such that it warrants protection by a statute
that embodies the public policy of encouraging *participation* in matters
of public significance."   <u>Id.</u> at 119 (emphasis in original).   Finding
that standard was not met, the court denied the motion to strike.[4]   <u>Id.</u>;
<u>see also</u> <u>Dyer v. Childress</u>, 147 Cal. App. 4th 1273, 1282 (Ct. App.

---

[4] The court also noted that there may be some limit on the size and/or nature
of a particular group, organization, or community, in order for it to come
within the rule announced.   <u>Du Charme</u>, 110 Cal. App. 4th at 119.

2007) ("[C]ases involving disputes in the workplace do not involve matters of public interest as defined in section 425.16, even though the issue may involve free speech.")

In light of the authorities listed above, the Court finds that the third-party statements posted on the Ripoff Report website (and Magedson's conduct to the extent it furthers those statements) do not implicate matters of public interest. In this case, the speech at issue criticizes the employment practices of a small, virtually unknown company. The reports range from suggesting that AEI and its principals engage in criminal conduct, such as laundering money or paying workers illegally, to benign comments such as calling AEI's principal an idiot or stating that he does not know how to run a business. None of these comments rise to the level of a public issue.

First, unlike in <u>Sipple</u> or <u>Seeliq</u>, AEI is not a public company, and there is no evidence that it has thrust itself in the public eye in any meaningful way. AEI's principals, Mobrez and Llaneras, are not public figures. Second, as in <u>Rivero</u> and <u>Weinberg</u>, the statements here are not of interest to the general public. The comments relate to employment disputes between a private company and a very small universe of private individuals. The only persons who would possibly be interested in the website reports are AEI's principals and employees (a group totaling on average ten persons) or potential employees of AEI. Indeed, the limited interest in the statements is evidenced by the fact that the Internet reports, which are freely available to the public world-wide and have been posted in some instances for over a year, have generated a total of only 12 comments. (Opp'n at 10; Pls. Exh. B.) An interest of such limited magnitude is not protected under section

19

425.16.  Weinberg, 110 Cal. App. 4th at 1127 (the interest of a community of 700 token collectors was not sufficient meet the public interest requirement).

Finally, while the some of the reports accuse AEI of criminal conduct, such statements do not automatically fall within the protection of section 425.16(e).  Much like the situation in Rivero, here, there is no evidence that any criminal charges are pending against AEI, that allegations of misconduct have been reported to prosecutorial authorities, or that the authors of the reports are involved in civil disputes with AEI.  As stated above, the bald assertion of criminal conduct, on its own, is insufficient to implicate the public interest.

### a.   Defendants' Arguments

Defendants launch several arguments in support of the public interest requirement, none of which are persuasive.  First, Defendants argue that the statements posted on the Ripoff Report website constitute consumer protection information, which is protected under the anti-SLAPP statute.  Second, Defendants argue that the statements implicate the current unemployment crisis and workplace best-practices, issues of undisputed widespread public interest.  Finally, Defendants contend that statements which "question and criticize the business practices or ethics of individuals who interact with the public" are matters of public interest.  The Court addresses each of these arguments below.

### i.   Consumer protection information

Defendants rely primarily on Wilbanks v. Wolk, 121 Cal. App. 4th 883, 89-100 (2004) to support the proposition that consumer protection

20

information falls within the scope of the anti-SLAPP statute.   In
Wilbanks, the defendant, a former insurance agent, wrote several books
and operated a website regarding viatical settlements.   Id. at 889.   A
viatical settlement is an arrangement that allows a dying person with a
life insurance policy to sell his or her policy to investors for a
percentage of the death benefits.   Id.   The policies are sold through
independent sales agents or brokers, like the plaintiff in Wilbanks.
Id.   Defendant's website, in part, offered information to assist
persons in finding a reputable broker.   Id.   As part of this service,
defendant posted a "warning" about plaintiff's company on the website.
Id. at 890.   The warning stated that plaintiff's firm was unethical and
provided incompetent advice, was under investigation by regulatory
authorities, and had been subject to a judgment in a suit brought by "a
California viator."   Id.   Upon discovering the warning, plaintiff
brought a defamation suit against defendant.   Defendant countered that
her speech was protected by the anti-SLAPP statute.

In deciding whether the anti-SLAPP statute applied, the Wilbanks
court held: "Consumer information, . . . **at least when it affects a
large number of persons,** also generally is viewed as information
concerning a matter of public interest."   Id. at 898 (citing Paradise
Hills Association v. Procel, 235 Cal. App. 3d 1528 (Ct. App. 1991)
(emphasis added)).   The court noted that "the viatical industry touches
a large number of persons, both those who sell their insurance policies
and those who invest in viatical settlements."   Id. at 899.   Indeed,
plaintiff's business alone generated an average monthly income of
$58,333.   Id.   Moreover, the court pointed to the fact that defendant
had studied and written about the industry, and her website provided

consumer information about the industry as a whole, including educating
consumers about the potential for fraud.  Id.  Importantly, "the
statements made by [defendant] were not simply a report of one broker's
business practices, of interest only to that broker and to those who
had been affected by those practices."  Id. at 900.  To the contrary,
"in the context of information obstensibly provided to aid consumers
choosing among brokers, the statements, therefore, were directly
connected to an issue of public concern."  Id. at 900.

Wilbanks is readily distinguishable from the present case.[5]  First,
unlike the viatical settlement industry, it cannot be said that AEI's
employment practices affect a large number of persons.  As stated
above, Plaintiffs have introduced evidence that AEI employs an average
of 10 persons, including Mobrez and Llaneras.[6]  Thus, this information
only affects a small universe of AEI employees and potential hires.
Second, unlike the defendant Wilbanks, the persons who posted the
reports about AEI did not provide information about industry-wide
employment practices, nor do such persons purport to have any knowledge
or expertise in these areas.  Thus, the context of the reports is
wholly dissimilar from that in Wilbanks. Here, unlike in Wilbanks, "the
statements made by [the third-party authors] **were** . . . simply a report
of one [business's] practices, of interest only to that [business] and
to those who had been affected by those practices."  Id. at 900.

_____

[5]  The present case does not involve consumer information in the traditional sense,
as AEI does not offer any goods or services for charge to consumers.  Nonetheless,
the employment decisions at issue in the reports – i.e., whether to work for AEI –
can be analogized to a consumer choice, such as which product to buy.

[6] It may be that the service AEI provides – i.e., the economic information
provided on the AEI website – might reach a large number of persons.
However, the reports on defendant's website do not address the information
AEI disseminates to others.  Instead, the reports address only the
*employment practices* of AEI, a small and relatively unknown company.

Other cases in which consumer information was at issue further establish that such information is only protected where it affects a large number of persons – such as where the company at issue is large and publicly-traded.  For example, in <u>DuPont Merck Pharmaceutical Co. v. Superior Court</u>, 78 Cal. App. 4th 562 (Ct. App. 2000), the plaintiffs alleged that a manufacturer of Coumadin, an anticoagulant medication, had made false statements about the drug.  The court found that the manufacturer's statements met the public interest requirement and were protected by the anti-SLAPP statute.  <u>Id.</u> at 567.  The court noted that the plaintiffs had alleged that "more than 1.8 million Americans have purchased Coumadin . . . for the prevention and treatment of blood clots that can lead to life-threatening conditions." <u>Id.</u>  Thus, "both the number of persons allegedly affected and the seriousness of the conditions treated establish that the issue is one of public interest." <u>Id.</u>

Similarly, in <u>ComputerXpress Inc. v. Jackson</u>, 93 Cal. App. 4th 993 (Ct. App. 2001), the defendants made disparaging remarks to potential customers about a company selling computer-related products to the public.  <u>Id.</u> at 998.  The court concluded that the statements implicated the public interest because the plaintiff's company was publicly traded, with outstanding shares varying from 12,000,000 to 24,000,000.  <u>Id.</u> at 1008.  Additionally, the company had issued press releases to promote itself, thereby voluntarily putting itself in the public eye.  <u>Id.</u> at 1007.  Finally, the company's allegation that it lost $10 million as a result of defendant's statements suggested that the information was of importance to a large segment of the public. <u>Id.</u> at 1009.

1    The court reached a similar conclusion in <u>Global Telemedia Int'l,</u>

2    <u>Inc. v. Doe 1</u>, 132 F. Supp. 2d 1261, 1264 (C.D. Cal. 2001).  There, the

3    plaintiff made disparaging remarks about GTMI, a publicly-traded

4    telecommunications company with over 18,000 investors.  <u>Id.</u> at 1265.

5    GTMI had also "inserted itself into the public arena . . . by means of

6    numerous press releases."  <u>Id.</u>  In light of these facts, the court

7    held: "[A] publicly traded company with many thousands of investors is

8    of public interest because its successes or failures will affect not

9    only the individual investors, but in the case of large companies,

10   potentially market sectors or the markets as a whole."  <u>Id.</u>  In sum,

11   the size of the company and the number of persons affected by the

12   information satisfied the public interest requirement.

13   The other end of the spectrum is illustrated by <u>Sandra Caron</u>

14   <u>European Spa, Inc. v. Kerber</u>, No. A117230, 2008 WL 3976463 (Ct. App.,

15   Aug. 28, 2008).[7]  In <u>Sandra Caron</u>, defendants posted consumer reviews on

16   the Internet, which critiqued a local, family-owned day spa.  <u>Id.</u> at

17   *1, *5.  The reviews criticized the tacky décor of the spa, the rude

18   service, and the dirty and unhygienic conditions of the facilities.

19   <u>Id.</u> at *1.  The defendants argued that their reviews constituted

20   consumer protection information and were protected by the anti-SLAPP

21   statute.  <u>Id.</u> at *5-6.  The California Court of Appeals disagreed.

22   Distinguishing <u>Wilbanks</u>, the court noted:

23              The Internet postings which [plaintiffs] contend are
             protected speech under the anti-SLAPP statute critiqued a
24           local, family-owned spa . . . .  Caron Spa is not an entity
             that is in the public eye; nor are its owners.  Further, the
25

26   [7] <u>Sandra Caron</u> is not a published opinion.  California Rule of Court 8.1115(a)
     prohibits citation or reliance by a court on an unpublished California Appeal
     Court decision.  However, the rule is not binding in the federal courts.  <u>Cole</u>
27   <u>v. Doe 1 thru 2 Officers of City of Emeryville Police Dept.</u>, 387 F. Supp. 2d
     1084, 1103 n.7 (N.D. Cal. 2005).  Moreover, <u>Sandra Caron</u> is not cited as
28   decisional law, but rather for its persuasive reasoning.

> focus of each posting was extremely narrow and did not constitute a topic of widespread, public interest.  The statements did not embrace the quality of spas in general or within a widespread chain of facilities, or the health and safety issues pertinent to the spa industry. . . . [W]e are talking about a "mom and pop" local operation, not a large scale program or chain of operations and the matters reported on would not be of concern to a substantial number of people.

Id. at *5-6 (internal citations omitted).  Thus, while the Internet postings could be described as consumer protection information – i.e., counseling against going to Caron Spa – they were limited in scope and did not affect a large number of persons.  Id. at *5.  As such, the reviews were not protected by the anti-SLAPP statute.

Here, given the nature of AEI's business, the present case bears much more resemblance to Caron Spa than to Wilbanks, ComputerXpress, or Global Telemedia.  Certainly, the information provided by the Ripoff Reports can be construed as consumer protection information – the information is designed to dissuade persons from working for AEI.  But there is no evidence whatsoever that this information affects a large number of persons.  AEI is not a publicly-traded company; neither it nor its principals are in the public eye; no evidence indicates that AEI's success or failure would have any effect on the market or a large segment thereof.  Much like Caron Spa, it appears that AEI is akin to a "mom and pop" operation whose business practices would not be of concern to a large number of persons.  For these reasons, the reports are not protected under the anti-SLAPP statute.

### ii.   Issues of unemployment and employers' best practices

Next, Defendants argue that, because the reports discuss whether AEI is a good place to work, the statements address the broader issues

25

of the nation-wide unemployment crisis and desirable employment
practices - issues of undisputed public concern.  Defendant contends
that "the reports at issue relate directly to [those] topic[s];" thus,
"nothing further is needed" to find that the public interest
requirement is met.  (Mot. at 8.)  On this point, Defendant is simply
wrong.

In <u>Weinberg</u>, 110 Cal. App. 4th 1122, the court explained that
"there must be some degree of closeness between the challenged
statements and the asserted public interest; the assertion of a broad
and amorphous public interest is not sufficient."  <u>Id.</u> at 1132.  Where
the connection between the statements and the asserted public interest
is tangential at best, the statements cannot be said to implicate the
public interest.  <u>See id.</u>  For example, in <u>Consumer Justice Center v.
Trimedica International, Inc.</u>, 107 Cal. App. 4th 595, (Ct. App. 2003),
the court found that advertising claims made on behalf of a company
offering herbal supplements for breast enlargement did not invoke a
public issue.  <u>Id.</u> at 601.  The court recognized that herbal medicine
**in general** may be an issue of public concern, but the advertisement was
not about herbal supplements generally; the ads concerned "the specific
properties and efficacy of a particular product."  <u>Id.</u> (emphasis
added).  Thus, the anti-SLAPP statute did not apply.  <u>Id.</u>; <u>see also</u>,
<u>Commonwealth Energy Corp. v. Investor Data Exchange, Inc.</u>, 110 Cal.
App. 4th 26 (Ct. App. 2003) (defendant's telemarketing campaign
offering one company's investment services to callers did not implicate
the public interest in investment scams generally).

The present case is analogous to <u>Consumer Justice</u> and
<u>Commonwealth</u>.  Certainly, the national unemployment rate and the

economic downturn generally are matters of public concern.  Further,
the issue of which major U.S. companies are the best to work for is
also a matter of public interest.  (Mot. at 9 [citing Fortune
Magazine's list of "Top 100 Best Companies to Work For"].)  That said,
the reports on Defendant's website do not implicate these issues.  The
reports do not address what **general** characteristics make a company a
good place to work, nor do they comment on the unemployment crisis, job
creation policies, or other issues of widespread concern.  Instead, the
reports relate solely to the personal employment experiences of third-
parties with AEI, a small and virtually-unknown company.   Much like
the statements in <u>Consumer Justice</u> and <u>Commonwealth</u>, the fact that the
third-party reports may, in some abstract and tangential way, bear
relation to the national unemployment crisis is not sufficient to
satisfy the public interest requirement.[8]  <u>Wilbanks</u>, 121 Cal. App. 4th
at 898 ("[I]t is not enough that the statement refer to a subject of
widespread public interest; the statement must in some manner itself
contribute to the public debate.")

     Moreover, Defendants' reliance on <u>Gilbert v. Sykes</u>, 147 Cal. App.
4th 13 (Ct. App. 2007), is misplaced.  In <u>Gilbert</u>, the plaintiff
received various plastic surgery procedures at the hands of Dr. Sykes,
a "nationally recognized educator and leader in [plastic] surgery."
<u>Id.</u>  at 18.  Sykes was a prominent surgeon, as well as the Director of
Reconstructive Surgery at the U.C. Davis Medical Center, and had
published three books and over 90 articles on facial plastic surgery.
<u>Id.</u>  Nonetheless, despite Sykes' excellent credentials, plaintiff was

---

[8] Indeed, were Defendant's argument accepted, virtually any comment about one's
dissatisfaction with his or her job, if made in a public forum, would be a matter
of public interest.  The Court cannot accept this reasoning.

horrified by the results of her surgery.  _Id._ at 19.  Plaintiff created
a website titled "www.mysurgerynightmare.com," which, in addition to
publishing before and after photos and describing her own plastic
surgery experience, included information about how to select a doctor,
links to other research references, "red flags" or things to look out
for when choosing a surgeon, and a contact page where readers could
share their own experiences.  _Id._ at 24.

     Sykes brought a defamation suit against plaintiff, but plaintiff
argued that her speech was protected by the anti-SLAPP statute.  The
California Court of Appeals agreed.  The court held that, contrary to
Sykes' contentions, the website was not limited to information about
Gilbert's experience with Sykes, which on its own, was a private
matter.  _See id._ at 23.  Instead, the website contributed to the
overall public debate about plastic surgery – a subject of widespread
public concern – for numerous reasons: First, Sykes was a widely-known
and revered plastic surgeon who had published books and articles and
had appeared on local television shows regarding plastic surgery.
Second, the website was not limited to Sykes' services, but rather
provided information about how to select a doctor, research references,
warning signs when selecting a doctor, and allowed persons to post
their own stories to contribute to the public debate.  _Id._ at 24.  In
sum, the website "was not limited to attacking Sykes, but contributed
to the general debate over the pros and cons of undergoing cosmetic
surgery."  _Id._

     The present case is entirely distinguishable from _Gilbert_.  Here,
unlike the plaintiff's website in _Gilbert_, the reports on Defendants'
website **are limited to attacking AEI and its principals**.  The reports

do not contribute to the widespread national debate regarding
unemployment rates; indeed, apart from a passing reference to the
economic downturn, none of the reports even mention the economy or
unemployment rates.  As stated above, the issues raised in the reports
are narrowly directed only at AEI; as such, the reports do not
implicate the public interest.

### iii. Statements criticizing the ethics of persons dealing with the public

Defendants' final argument warrants the least discussion.
Defendants broadly assert that statements made in a public forum which
question the ethics and business practices of persons dealing with the
public are matters of public concern.  (Mot. at 7.)  However, none of
the cases cited by Defendants are applicable here.

First, as stated above, Sipple v. Foundation for National
Progress, 71 Cal. App. 4th 226 (Ct. App. 1999), involved statements
about a nationally-known political consultant abusing his former
spouse.  Additionally, the consultant had devised media strategies for
political candidates that capitalized on the issue of domestic violence
prevention.  Id. at 239-40.  Thus, the consultant was a public figure
who had made his success, in part, by campaigns connected to the very
issue addressed in the allegedly defamatory statements.  Similarly, in
Global Telemedia, 132 F. Supp. 2d at 1265-66, the company about which
the statements were made was a large, publicly-traded company and its
business practices affected a large segment of the market.  Id. at
1265.  In each of these cases, the plaintiffs were public figures or
entities whose business practices affected many persons.  As stated
above, AEI does not fit this mold.

Moreover, Barrett v. Rosenthal, 40 Cal. 4th 33 (2006) does not assist Defendant.   Contrary to Defendant's assertion, the California Supreme Court in Barrett did **not** hold that statements criticizing the character and competence of two physicians were matters of public interest within the meaning of section 425.16.   Although the trial court had come to that conclusion, the plaintiffs did not challenge that ruling on appeal.   Id. at 41.   Thus, the California Supreme Court did not rule one way or another on the public interest issue.   Id. Furthermore, the trial court's ruling, which found that the criticisms implicated an issue of public interest, was based at least in large part on the fact that the physicians had become public figures with regard to the topic of health care fraud.   Barrett v. Clark, No. 833021-5, 2001 WL 881259, at *5 (Sup. Ct., July 25, 2001).   Each of the physicians operated websites, published articles and books, and spoke publicly about alternative medicine and health care fraud.   Id. The trial court held, "the substantial publicity received by these plaintiffs is more evidence that the issue is a matter of public interest."   Id.   Thus, like the plaintiff in Sipple, the physicians had voluntarily inserted themselves into a matter of public controversy and debate.   Here, however, there is no evidence that AEI or its principals have any notoriety or have ever sought public attention on the issue workplace best practices.

In sum, Defendant has not cited, and the Court has not found, any authority indicating that criticism of the business ethics of private persons running a small, virtually unknown company are matters of public concern.   See Dyer, 147 Cal. App. 4th at 1281 (statements about the character of a person not in the public eye are not a matter of

public interest).  For the reasons stated above, the Court concludes
that the statements about AEI posted on Defendants' website are not a
matter of public interest.

### 2.   Whether Magedson's and Ripoff Report's Conduct Implicates Section 425.16(e)(4)

Defendants contend that the conduct of Magedson, independent of
the statements made by third parties on the Ripoff Report website,
implicate matters of public interest and are protected under section
425.16(e)(4).  For example, Defendants argue that Xcentric and Magedson
use the Ripoff Report website to solicit non-tax-deductible donations,
which is protected First Amendment speech.  Further, Defendants argue
that the CAP program implicates Magedson's First Amendment right to
engage in "corporate or consumer advocacy."  (Mot. at 10.)  Thus,
Defendants conclude that, to the extent Plaintiffs' claim of unfair
business practices under California Business & Professions Code § 17200
is based on this conduct, such conduct is protected by the anti-SLAPP
statute.

The Court agrees with Plaintiffs that Defendants' argument
misconstrues Plaintiffs' unfair business practices claim.  While the
allegations in the Complaint mention that Defendants represent
themselves as consumer advocates, this appears to be only for purposes
of context.  The crux of the unfair business practices claim is that
Defendants allegedly extort money from the subjects of complaints on
the Ripoff Report website in exchange for promising to favorably alter
such complaints.  (Compl. ¶¶ 53(a), 55.)  As Defendant conceded in its
moving papers, the claims based on alleged extortion "are arguably not
based on 'protected conduct' within the meaning of CCP § 425.16."

(Mot. at 3.); see <u>Flately v. Mauro</u>, 39 Cal. 4th 299, 320 (2006) (speech
or activity that is "illegal as a matter of law," such as extortion, is
not constitutionally protected under the anti-SLAPP statute).
Plaintiffs have indicated (Opp'n at 12), and the Court agrees, that the
unfair business practices claim is predicated on Defendants' alleged
extortion scheme, and not on Xcentric's solicitation of non-tax
deductible donations or general acts of "corporate advocacy." Thus, it
is immaterial whether these latter acts are protected activity under
the anti-SLAPP statute.

    **C.   Second Step: Whether Plaintiff Will Prevail on the Merits**

    Having concluded that Defendants did not meet their burden of
establishing that the anti-SLAPP statute applies, the Court need not
address whether Plaintiffs' claims are likely to succeed on the merits.
Further, the Court believes that this issue will be better addressed by
way of a summary judgment motion, which will give the Court a greater
understanding of how the Ripoff Report website operates, what
alterations (technical or otherwise) are made to third-party's reports,
and the significance of those alterations under the Communications
Decency Act.

    For the reasons stated, Defendants' Motion to Strike under section
425.16 is DENIED.

**IV.  Request for a RICO Case Statement**

    Defendant's final request is that the Court order Plaintiffs to
file a "RICO Case Statement," which would outline the factual and legal
basis for Plaintiff's RICO claims. RICO case statements are not
required by any Federal Rule of Civil Procedure. However, several
district courts require plaintiffs to supply the defendant with a RICO

case statement.  See <u>Wagh v. Metris Direct, Inc.</u>, 363 F.3d 821, 827 (9th Cir. 2003) (discussing "widespread use" of standing orders for RICO case statements).  Defendant has submitted the RICO case statement forms used by Judge Selna and Judge Matz, and asks that this Court require Plaintiff's to use Judge Selna's form, as it is more detailed.

Having reviewed the Complaint, and listed to the arguments made at the initial status conference attended by both parties, the Court concludes that a RICO Case Statement is not necessary.  The factual allegations and legal predicates underlying the RICO claims are reasonably clear and appear to be understood by both parties.  Therefore, Defendants' request for a RICO case statement is DENIED.

**V.    Conclusion**

For the reasons stated, Defendants have not met their burden of demonstrating that the anti-SLAPP statute applies to Plaintiffs' First and Second, and Fifth through Tenth causes of action.  Defendants' motion to strike under Section 425.16 is therefore DENIED.  Defendant's request for an order requiring Plaintiffs to submit a RICO case statement is also DENIED.

IT IS SO ORDERED.

DATED:     04/20/10

_____
STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE

33