UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ASIA ECONOMIC INSTITUTE, a California limited liability company, RAYMOND MOBREZ, an individual, and ILIANA LLANERAS, an individual, | ) ) ) ) ) | CV 10-1360 SVW (PJWx) |
| | ) ) | ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY |
| Plaintiffs, | ) ) | JUDGMENT AS TO THE RICO CLAIMS TO THE EXTENT THOSE CLAIMS ARE |
| v. | ) ) | BASED ON PREDICATE ACTS OF EXTORTION [40]; DENYING |
| XCENTRIC VENTURES, LLC, an Arizona limited liability company, d/b/a/ as BADBUSINESS BUREAU and/or BADBUSINESSBUREAU.COM, and/or RIP OFF REPORT and/or RIPOFF REPORT.COM; BAD BUSINESS BUREAU, LLC, organized and existing under the laws of St. Kitts/Nevis, West Indies; EDWARD MAGEDSON, an individual, and DOES 1 through 100, inclusive, | | PLAINTIFFS' EX PARTE APPLICATION FOR A CONTINUANCE OF THE SUMMARY JUDGMENT MOTION UNDER RULE 56(f) [87]; GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT AS TO THE RICO CLAIMS BASED ON PREDICATE ACTS OF WIRE FRAUD; AND GRANTING PLAINTIFFS' MOTION FOR A BENCH TRIAL [50] |
| Defendants. | | |

I.    **INTRODUCTION AND PROCEDURAL BACKGROUND**

Plaintiffs Asia Economic Institute, LLC ("AEI") and its principals, Raymond Mobrez and Iliana Llaneras (collectively, "Plaintiffs" or "AEI") brought this action on January 27, 2010.  The

case was removed to this Court in February 2010 on the grounds of both federal question and diversity jurisdiction.  Plaintiffs generally allege that Defendants Xcentric Ventures, LLC ("Xcentric"), Bad Business Bureau, LLC, and Edward Magedson (collectively "Defendants") own and operate a website at www.RipoffReport.com ("Ripoff Report") and that defamatory comments regarding AEI and its principals were posted on the website.  Plaintiffs assert several claims against Defendants arising out of these allegedly defamatory posts (and Defendants' conduct related thereto) including defamation, unfair business practices, intentional and negligent interference with prospective economic advantage, and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

On April 19, 2010, the Court held an initial case status conference at which both parties appeared and were represented by counsel.  The Court instructed the parties that it was bifurcating Plaintiffs' third and fourth causes of action under the RICO statute, 18 U.S.C. § 1962(c), and 1962(d), to the extent that those claims are based on the predicate acts of extortion, and ruled that those claims would be tried first.  The Court set a trial date for August 3, 2010. The Court also ruled that the issue of damages would be bifurcated; thus, the August 3, 2010 trial would only address Defendants' liability under the RICO statute.  Consistent with this ruling, Plaintiffs made a motion before Magistrate Judge Walsh to bifurcate discovery so as to limit discovery prior to August 3, 2010 to the RICO/extortion claims only.  Magistrate Judge Walsh granted the motion on June 24, 2010. (Order, Docket No. 82.)

On May 24, 2010, Defendants filed a Motion for Summary Judgment as to Plaintiffs' entire case.  Plaintiffs opposed the motion and also filed an ex parte application for a continuance of the summary judgment motion so as to conduct further discovery under Federal Rule of Civil Procedure 56(f).

On May 31, 2010, Plaintiffs filed a Motion to Enforce Defendants' Waiver of a Jury Trial and for a Bench Trial.  Defendants did not oppose the motion.

The motions came before the Court for a hearing on July 12, 2010. Additionally, at the July 12, 2010 hearing, the Court raised the issue of whether the Plaintiffs' Complaint was sufficient to state a plausible claim for RICO violations based on the alleged predicate acts of wire fraud.  Defendants' argued that the Complaint was not sufficient, and made an oral motion to dismiss those claims for failure to plead the alleged acts of wire fraud with particularity.

Having read and considered the parties' briefing, the evidence submitted therewith, and the parties' oral arguments, and for the reasons stated below, Plaintiffs' Ex Parte Request for a Continuance of the Motion for Summary Judgment under Rule 56(f) is DENIED. Defendants' Motion for Summary Judgment is GRANTED IN PART as to the third and fourth causes of action under RICO, to the extent those claims are based on the alleged predicate acts of extortion or attempted extortion.  Defendants' Motion to Dismiss Plaintiffs' third and fourth causes of action under RICO, to the extent those claims are based on alleged acts of wire fraud, is GRANTED WITH LEAVE TO AMEND. Plaintiffs' Motion for a Bench Trial is GRANTED.

## II.   FACTUAL BACKGROUND

The following material facts are undisputed unless otherwise noted.  As the Court has bifurcated this case so as to first resolve only the issue of whether Defendants are liable under the RICO statute based on predicate acts of extortion, the Court has not considered Defendants' arguments regarding Plaintiffs' state law claims or regarding Plaintiffs' alleged damages (or lack thereof).  The Court will only address facts that are relevant to the RICO/extortion[1] claims.

### A.   Asia Economic Institute ("AEI")

Plaintiff Asia Economic Institute ("AEI") was formed sometime in 2000 and conducted business in California for nine years.  (Defs. Statement of Undisputed Facts [hereinafter "DSUF"] 4-5.)  AEI is owned and operated by its principals, Plaintiffs Raymond Mobrez and his wife Iliana Llaneras.  (DSUF 3.)  The company operated as a free, on-line, non-governmental publication of current news and events.  (Declaration of Raymond Mobrez, dated May 3, 2010, ¶ 2.)  At the times relevant to this lawsuit, AEI was planning to produce seminars and conferences, and was considering selling memberships to some of those programs.  (Plaintiffs' Statement of Genuine Issues [hereinafter "PSGI"] 6, 8.)  However, AEI never actually produced any seminars.  (DSUF 8.)  During its nine years in operation, AEI's total revenues were $0 and its profits were $0.  (DSUF 9.)  AEI ceased all business operations in June 2009.  (DSUF 10.)

### B.   Xcentric and www.RipoffReport.com

---

[1] When the Court refers to the "RICO/extortion" claims, the Court is referring to Plaintiffs' third and fourth causes of action under the RICO statute, to the extent that those alleged violations are based on the alleged predicate acts of extortion or attempted extortion.

Defendant Xcentric Ventures, LLC ("Xcentric") operates the website www.RipoffReport.com ("Ripoff Report"), which started in 1998. (DSUF 1-2.)  Defendant Edward Magedson ("Magedson") is the founder and manager of Xcentric and the "ED"itor of the website. (DSUF 2.)   The website is a consumer reporting website where third party consumers can document complaints about companies or individuals. (PSGI 1.) Magedson contends that the Ripoff Report is the leading complaint reporting website on the Internet. (Magedson Decl., dated May 24, 2010, ¶ 2.)  The posting service is free to use – the Ripoff Report does not charge anything to users who create reports, viewers who read reports, or persons who post comments or rebuttals to the reports. (Id. ¶ 4.)

If an author wants to submit a report on the Ripoff Report website, they must first create a free user account. (Smith Decl. ¶ 4.)  The user is required to provide their name, address, phone number, and other information, all of which may be falsified. (Id.)  The user is then required to provide an email address, which the server automatically confirms by sending an email to that address prior to allowing the user to post anything. (Id.)  To draft a report, users are guided through a five step process. (PSGI 3.)  In Step 1, the user must input certain information about the company they are reporting, including the name, address, and phone number. (PSGI 4.)   In Step 2, the user is asked to create a "report title" by filing out a series of four blank boxes into which the user can enter (a) the company name; (b) words explaining what the report is about; (c) the city where the company is located, and (d) the state where the company is located.

(Smith Decl. ¶ 6.)[2]  The user is also asked to select a topic and category for the report from a list of more then 500 available choices – such as "Dining" or "Court Judges." (Id. ¶ 7.)  In Step 3, users are presented with a blank box where they can add the text of the report. Other than generic style guidelines, such as "DO NOT use ALL CAPITAL LETTERS," the page does not encourage, solicit, or instruct users to say anything in particular. (Id. ¶ 8.)  Step 4 allows users to attach photos or images to their report if they wish. (Id. ¶ 9.)  Finally, in Step 5, users are asked to review the Terms of Service, which require the users to (among other things) refrain from posting anything false or defamatory. (Id. ¶ 10.)  Users are also required to review and affirm that their reports are valid and to check a box indicating as much.

Every user-generated submission to the Ripoff Report website is reviewed by a staff of monitors who are authorized to make minor editorial changes to redact certain types of content – e.g., offensive language, social security numbers, bank account numbers, profanity, threats. (Id. ¶ 11.)  Ripoff Report staff is not authorized to make any other changes to the reports. (Id.)[3]  After a report has been reviewed by the staff it is posted to the website using a standard

---

[2] Plaintiffs attempt to dispute the facts noted in the previous two sentences, but Plaintiffs' arguments indicate that there is no actual dispute; Plaintiffs are simply quibbling over phrasing.  For example, Plaintiffs state that these facts are disputed because: "[Users] are required to disclose certain information regarding an individual or company at the Web site's direction." (PSGI 69.)  The Court sees no meaningful distinction between Plaintiffs' qualifications and the information contained in the Declaration of Ben Smith, upon which Defendants rely for these facts.  Thus, the Court accepts these facts as undisputed.
[3] Plaintiffs dispute this fact and assert that the Defendants also add the term "Ripoff Report" to the text supplied by the author for the title of the report. (PSGI 80.)  In support of this fact, however, Plaintiffs cite an answer filed by Defendants in a separate case, Certain Approval Programs, LLC v. Xcentric Ventures, Case No. CV 08-1608-PHX-MHB, in 2008.  While this Answer indicates Defendants' practices in 2008, Plaintiffs do not offer any evidence that Defendants added the term "Ripoff Report" to user-generated reports at the times relevant to this action.

format. (Id. ¶ 12 and Exh. F.) Anyone who wishes to respond to the report may do so by posting a comment or a rebuttal for free at any time. (Id. ¶ 13; PSGI 20-21.) The only requirement for posting a rebuttal is that the user must create a free account with the Ripoff Report website. (Id. ¶ 13.)

Finally, when a report is submitted to the Ripoff Report website, Xcentric's servers automatically combine the unique text supplied by the author with various HTML code that is generic to every page on the website. (Id. ¶ 14.) During this process, and using keywords supplied by the author in the text of the report (such as the name of the company being reported), Xcentric's servers automatically create "meta tags," which are used by search engines such as Google and Yahoo to index the contents of the specific page at issue. (Id.) Xcentric's servers also automatically include three different keywords – rip-off, ripoff, rip off – into the meta tags of every page on the website. (Id. ¶ 15.) The meta tags are not visible in the title or body of any particular report; they are simply indexing references used by search engines in order to accurately reflect the source of the indexed page. (Id. ¶ 15.) However, individuals with basic technical knowledge who choose to view the actual HTML code for a report's webpage can view the meta tags that are used for indexing purposes. (Id. ¶ 14.)

**C. Ripoff Report's Corporate Advocacy Program**

When a user posts a negative report on the Ripoff Report website, the subject of the complaint has various options for addressing the negative report. First, the subject may post a free "rebuttal" or comment to the third-party report explaining his or her side of the story. (PSGI 20-21.) Second, a company or individual can deal with

negative reports by joining Ripoff Report's Corporate Advocacy Program ("CAP"). (See PSGI 23.) Magedson describes the purpose of the CAP program as follows: "The goal of the program is to ensure that complaints submitted by unhappy customers are resolved and that the root problems which caused these complaints are fixed so that future complaints can be reduced or avoided." (Magedson Decl., dated May 24, 2010, ¶ 9.) A company who joins the CAP program is required to agree in writing that it will work with the Ripoff Report and the complainants to resolve the complaints. (Id. ¶¶ 10, 15.) As a condition of joining the CAP program, the company is required to accept some level of responsibility for customer complaints even if it does not agree with them. (Id.)

Once a company joins CAP, Ripoff Report agrees to act as a liaison between the CAP member and the persons who posted negative reports about the CAP member on the website. (Id. ¶ 11.) Ripoff Report sends an email that was drafted with the CAP member's input to each author who has submitted a report about that CAP member. (Id.; see Mobrez Decl., Exh. M.) The email explains that the CAP member has joined the program and has made a commitment to resolve the customer's complaint quickly and fairly. (Magedson Decl. ¶ 11.) Ripoff Report also posts a message at the top of every complaint posted about the CAP member on the website, explaining that the member has joined the CAP program and is committed to increasing customer satisfaction and working with Ripoff Report to resolve past and future complaints. (Id. ¶ 12; Mobrez Decl., Exh. M.) Finally, the Ripoff Report website states that members in the CAP program will be permitted to "provide your side of

the story and link to your own website, where you may post your commitment." (Mobrez Decl., Exh. M.)

Membership in the CAP program never includes the removal of reports, nor does Ripoff Report change the text of the user-submitted reports for CAP members. (Magedson Decl. ¶ 13.) The only alteration to the reports is to add an introduction to each report explaining that the company has joined the program. (Id.) There is no evidence that Ripoff Report has ever removed a report from its website in exchange for money, nor is there any evidence that Defendants promised to do so.

It is undisputed that membership in the CAP program requires the payment of an initial flat fee of $7,500, as well as a monthly fee. (PSGI 29; Xcentric Depo. at 40.) However, there is some dispute as to how the monthly fee is calculated. Plaintiffs have submitted evidence of a page on the Ripoff Report website, which describes the CAP program in some detail and states that the monthly fees are based "upon the number of Reports filed, the number of offices you have, and/or the size of an average sale." (Mobrez Decl., Exh. M.) Magedson testified, however, that this statement on the website is in error and that the only method he has ever used to calculate the monthly fee for the CAP program is the number of complaints filed regarding the CAP member. (Magedson Decl., dated June 23, 2010, ¶ 4-6; Magedson Depo. at 101, attached as Exhibit 7 to Borodkin Decl.).

It is undisputed that Plaintiff AEI never joined the CAP program and never paid any money to Defendants. (DSUF 46.)

**D.   Reports About AEI**

On or about February 2009, Plaintiffs Mobrez and Llaneras conducted a search on Google.com for Internet sources referring to the

terms "Raymond Mobrez," "Mobrez," "Iliana Llaneras," "Llaneras," and "AEI."  (Mobrez Decl., dated March 29, 2010, ¶ 3 [Docket No. 11].)  At that time, Plaintiffs discovered that there were four reports about AEI, Mobrez, and/or Llaneras posted on the Ripoff Report website. (Id.)  To date, there are six reports regarding Plaintiffs on Defendants' website.  (Id. ¶ 4.)  Two of the reports were filed in February 2010, after this action was filed.  (Magedson Decl., dated May 24, 2010, ¶ 59.)

Generally, the reports written about Plaintiffs purport to be written by former employees of AEI and state that AEI is a bad place to work.  (See DSUF 12-18; Mobrez Depo., Exhs. 1A, 2A, 3A, 4A, 5A, 6A.) Among other things, the reports state the following: "They reduce pay illegally;" "Complete disorganization;" "[T]hey have no idea to [sic] run any business and just continue to ruin people's lives . . .;" "[O]nce you start working, nothing ever gets done. . . . There are a couple of theories that could explain this paradox.  One is that they are laundering money . . .;" "They treat their employees like dirt;" "Asia Economic Institute it's a SCAM;" and "They routinely ignore employment laws."  (Id.)  The reports also call into question whether Mobrez's stated credentials are accurate and state that Mobrez hires and fires on the basis of race, religion and gender.  (Id.)  Other more innocuous comments include that Mobrez and Llaneras are "boring," "crazy," and "secretly married."  (Id.)

The six reports about Plaintiffs were created by third parties, not by Defendants Magedson or Xcentric.[4]  (DSUF 63; Magedson Decl.,

---

[4] Plaintiffs dispute this fact by stating that: "Defendants have not yet disclosed the identity of the posters.  Discovery is ongoing and Plaintiffs have a pending motion to compel discovery and a motion to bifurcate discovery."  (PSGI 64.)  This does not create a genuine dispute of fact as to the authors of the reports.  First, the Plaintiffs' motion to compel only

dated May 24, 2010, ¶ 60; see Mobrez Depo. at 98:5-99:5, 107:22-108:17;
Craven Decl. ¶ 7; Thompson Decl. ¶ 7; Jordan Decl. ¶ 7.)   Before the
reports were posted on the site, each report was reviewed by one of
Xcentric's staff of content monitors.  (DSUF 65.)   Ripoff Report's
servers automatically create a log showing the identity of each content
monitor who reviewed the reports about AEI before they were posted.
(DSUF 66.)   The reports that were posted on January 28, 2009, June 1,
2009, and February 19, 2010 were reviewed by Amy Thompson.  (Thompson
Decl. ¶ 6; Smith Decl. ¶ 17.)   The report posted on February 13, 2009
was reviewed by Kim Jordan.  (Jordan Decl. ¶ 6; Smith Decl. ¶ 17.)   The
report posted on September 30, 2009 and February 3, 2010 were reviewed
by Linda Craven.  (Craven Decl. ¶ 6; Smith Decl. ¶ 17.)   All three
witnesses have submitted declarations stating that they did not create
or alter any part of these reports about AEI.  (Craven Decl. ¶ 7;
Thompson Decl. ¶ 7; Jordan Decl. ¶ 7.)

E.   **Communications Between the Parties Regarding the AEI Reports**[5]

When Plaintiffs first learned about the reports concerning AEI on
the Ripoff Report website, Plaintiff Mobrez sent an email to the
address for Ripoff Report, info@ripoffreport.com, on February 15, 2009.
(Mobrez Decl.[6] ¶ 4, Exh. A.)   The email stated that Mobrez was aware of

sought a continuation of the Magedson Deposition; it did not relate in any way
to a request for information about the authors of the reports.  As far as the
Court can tell, Plaintiffs had not made a discovery request for information
regarding the authors of the reports prior to the filing of their Opposition.
Further, Defendants have declared that they did not create the reports, and
Plaintiffs have not come forward with any evidence rebutting that assertion.
Thus, the Court accepts as undisputed the testimony of Magedson, Craven,
Thompson, and Jordan that they did not create the reports at issue.
[5] The Court has not considered the electronic recordings of the communications
between Defendant Magedson and Plaintiff Mobrez, for the reasons stated below.
Thus, the Court summarizes the facts contained in the declarations of
Magedson, Mobrez, and Llaneras, including the corrected declarations filed on
May 20, 2010.
[6] For purposes of this section, "Mobrez Declaration" refers to the original
Declaration of Raymond Mobrez filed on May 3, 2010 detailing his contact with
Defendants.  "Corrected Mobrez Declaration" refers to the Declaration of
Raymond Mobrez filed on May 20, 2010 detailing his contacts with Defendants.

some of the reports about himself and AEI on the Ripoff Report website,
that the reports were false, "defamatory and libelous," and that the
recipient of the email needed to "immediately remove these derogatory
remarks." (Id., Exh. A.)  The email also requested the names and
contact information of the individual(s) who posted the report(s) on
the website.  (Id.)  Defendants did not respond. (Mobrez Decl. ¶ 4;
Magedson Decl., dated May 24, 2010, ¶ 20.)  On April 3, 2009, AEI
posted a free rebuttal to each of the reports concerning AEI, Mobrez,
and Llaneras on the Ripoff Report website.  (Mobrez Decl. ¶ 5, Exh. B.)

On April 27, 2009, Mobrez placed three separate calls to the main
telephone number listed on the Ripoff Report website.  (DSUF 24.)
Mobrez does not recall specifically what was said on the calls.
(Corrected Mobrez Decl. ¶ 2-4.)

The next day, on April 28, 2009, Mobrez sent an email to the email
address EDitor@ripoffreport.com.  (Mobrez Decl. Exh. D.)  The email
stated that Mobrez had spoken with someone at the Ripoff Report the
previous day who had asked Mobrez to explain who he was and why he was
calling.  The email then explained that Mobrez was emailing because
reports about AEI were posted on the Ripoff Report website.  Mobrez
asked the email recipient: "How can you assist us in removing these
bogus posts from your website?" (Id.)  Magedson does not recall ever
receiving this email.  (Magedson Decl., dated May 24, 2010, ¶ 22.)

On May 5, 2009, Mobrez again contacted the Ripoff Report by phone
and spoke to someone who identified himself as Ed Magedson.  (Mobrez
Decl. ¶ 10; see Magedson Decl. ¶ 11.)  Mobrez does not recall what
specifically was said during that conversation.  (Mobrez Corrected
Decl. ¶ 2-4.)  After the conversation, on May 5, 2009, Mobrez re-sent

his April 28, 2009 email to Magedson at EDitor@ripoffreport.com. (Mobrez Decl. ¶ 11, Exh. F.)  Magedson recalls receiving this email. (Magedson Decl., dated May 24, 2010, ¶ 22.)

On the same day, May 5, 2009, Magedson responded to Mobrez's email with a lengthy form email, which he normally sends to people who email Magedson asking about their options for responding to a report.  (Id.; Mobrez Decl., Exh. G.)  The form email spans six pages. (Mobrez Decl., Exh. G.)  Among other things, the email states that Ripoff Report does not verify or investigate the truth of complaints posted on its website and encourages the subjects of reports to file a free rebuttal to any reports.  (Id.)  The email also includes a warning to those persons who are thinking of suing the Ripoff Report.  The email states: "To those of you who threaten to sue, be prepared to go the long haul, and when you want to do a walk away because you realize you cannot and will not win because you filed a frivolous law suit,  . . . you will be paying for our legal bill and in some cases and then some, before we will let you out of the case."  (Id.)  The email goes on, "Suing us will only get you more publicity and additional listings on search engines . . . Why do we win? – just do a Google search for Communications Decency Act."  (Id.)   The email also emphasizes several times that Ripoff Report **never** removes reports from the website, and that it will not do so for any amount of money.  (Id.)  The email states that the website allows the authors of the reports to update their report with positive or negative information, but the reports are never removed.  (Id.)

The May 5, 2009 email also contains some limited information about the Ripoff Report's Corporate Advocacy Program ("CAP").  (Id.)  The email states that the CAP program: (1) "changes the negative listings

on search engines into a positive along with all the Reports on the Ripoff Report . . . (Reports are never deleted)"; (2) "allows [the Ripoff Report] to email everyone who file[d] a complaint that the business has contacted Ripoff Report and wants to make things right"; and (3) "this . . . is later Reported in our findings about your company we post to every Report about your business." (Id.)   The May 5, 2009 email also contains a link to the "intake form" for the CAP program, and also includes a link to a page on the website with more information about the CAP program.  (Mobrez Corrected Decl., Exh. M.)

The May 5, 2009 email does not contain any demand for money or even any reference to fees for the Corporate Advocacy Program.  (Mobrez Decl., Exh. G.)  The email does not contain any promise to take down a report from the website in exchange for money – in fact, it expressly disavows doing so.  Similarly, the email does not contain any promise that joining the CAP will result in future reports being blocked from the website.  (Id.)

The webpage to which the May 5, 2009 email provides a link (Mobrez Corrected Decl., Exh. M) describes the CAP program in broad terms.  For example, it indicates that membership in the program will authorize the Ripoff Report to contact the authors of reports to try and facilitate a resolution, and that CAP members authorize the Ripoff Report to include a positive message at to the top of each report about the CAP member.  (Id.)  The webpage also states that membership in the CAP program requires the payment of an initial flat fee and monthly payments, but does not state the amount of such fees.  (Id.)

After receiving the May 5, 2009 email, Mobrez again spoke to Magedson by phone.  (Mobrez Decl. ¶ 13; Magedson Decl., dated May 24,

14

1    2010, ¶ 14.)  Mobrez does not recall specifically what was said on this

2    phone call.  (Mobrez Corrected Decl. ¶¶ 2-4.)

3        On May 12, 2009, Mobrez again contacted Magedson by telephone.

4    (Mobrez Decl. ¶ 14; Magedson Decl., dated May 24, 2010, ¶ 30.)  This

5    was the final telephone conversation between the parties.  (Id.)

6    Mobrez does not recall specifically what was said during this phone

7    call.  (Mobrez Corrected Decl. ¶¶ 2-4.)  Magedson recalls that he told

8    Mobrez that he needed to receive an email with Mobrez's CAP application

9    form before Magedson could engage in any further discussions with him.

10   (Magedson Decl., dated May 24, 2010, ¶ 30.)  Magedson recalls that

11   Mobrez told him that he had already sent an email to Magedson, which

12   Magedson understood as meaning that Mobrez had completed the CAP

13   application form.  (Id.).  After this phone call, Magedson looked for a

14   completed CAP application form filled out by Mobrez, but could not find

15   one.  (Id. ¶ 32.)  Thus, later that day, Magedson sent an email to

16   Mobrez stating that Mobrez "drove him crazy" because Magedson spent so

17   much time looking for a form Mobrez never filled out.  (Id.)

18       On July 24, 2009, Mobrez and Magedson had two final email

19   conversations.  First, Mobrez emailed Magedson and told him once again

20   that the reports about AEI, Mobrez, and Llaneras on the Ripoff Report

21   website were false and easily disproved.  (Mobrez Decl., Exh. J.)

22   Mobrez stated that he could not fill out the CAP application form

23   because it would require AEI to stipulate to things it had not done,

24   things which were "flagrant untruths."  (Id.)  Mobrez asked Magedson if

25   he ever came to Los Angeles so that the two of them could meet in

26   person.  (Id.)  Magedson responded by email the same day.  (Mobrez

27   Decl., Exh. K.)  Magedson stated that there was no sense in meeting and

28

that, "I want to help you, but there is nothing we can do." Magedson stated: "We do not remove reports. We've spent over 3.4 million in legal fees – never lost a case – people know. We DO NOT REMOVE REPORTS. . . . No amount of money can change this." (<u>Id.</u>) The parties did not speak again prior to the filing of this lawsuit.

Magedson contends that he had a total of four telephone conversations with Mobrez in April and May of 2009, all of which were initiated by Mobrez. (Magedson Decl., dated May 11, 2010, ¶ 14.) Magedson declares that he never called Mobrez. (<u>Id.</u>) Magedson declares that, during these telephone conversations, he never asked Mobrez for money, never asked him if his company was profitable or how it made money, never told him that the payment of a fee to Xcentric would result in negative information being changed into a positive, and never told Mobrez that a lawsuit against Ripoff Report was likely to fail. (<u>Id.</u>) Plaintiffs offer no evidence to rebut Magedson's account of these four phone calls.[7] Finally, Magedson declares that, as a general policy, he never discusses the CAP program over the phone with anyone unless they have already contacted the Ripoff Report in writing to apply for the program, which Mobrez never did. (<u>Id.</u> ¶ 16.)

As stated above, Mobrez admits that he does not accurately recall what was said in the phone conversations with Magedson in April and May 2009 and that he had "confused some of what was said in my telephone conversations with what was written in the e-mail correspondence between myself and Mr. Magedson." (Mobrez Corrected Decl. ¶¶ 2-4.) Mobrez declares that "[t]here were a number of calls made by me to

---

[7] Initially both Mobrez and Llaneras filed Declarations on May 3, 2010 in which they described the April and May 2009 phone conversations between Magedson and Mobrez. The Plaintiffs' descriptions of those calls differed significantly from Magedson's account. However, on May 20, 2010, both Plaintiffs filed amended declarations and testified that their previous accounts of the phone calls were inaccurate.

Ripoff Report.  In addition, there were a number of incoming calls to
me from Ripoff Report." (Id. ¶ 2.)  Mobrez declares that he
specifically recalls "a telephone conversation with someone who
mentioned 'five grand' as the cost for joining the Corporate Advocacy
Program," but does not remember the exact date or time of the call and
does not know who the speaker was, or if it was Magedson.  (Id. ¶ 5.)
Finally, Plaintiff Llaneras declares that during one phone call, Mobrez
instructed her to listen in on another receiver and she heard Mobrez
discussing money with someone she could not identify.  (Llaneras
Corrected Declaration ¶ 4.)

**III. MOTION FOR SUMMARY JUDGMENT**

**A.   Scope of the Motion**

As a preliminary matter, the Court notes that it has only
considered those arguments in Defendants' summary judgment motion
related to Defendants' liability under the RICO statutes based on the
alleged predicate acts of extortion.  Although Defendants moved for
summary judgment as to Plaintiffs' entire case, such a motion was
inappropriate given the Court's prior Order bifurcating the
RICO/extortion claims from the remaining claims and from the issue of
damages.

**B.   Legal Standard**

Summary judgment is appropriate when the evidence, viewed in the
light most favorable to the nonmoving party, shows that there is no
genuine issue as to any material fact, and that the moving party is
entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c);
Tarin v. County of Los Angeles, 123 F.3d 1259, 1263 (9th Cir. 1997),
*superseded by statute on other grounds, as stated in* Leisek v.

<u>Brightwood Corp.</u>, 278 F.3d 895, 899 n.2 (9th Cir. 2002).  "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth."  <u>SEC v. Seaboard Corp.</u>, 677 F.2d 1289, 1293 (9th Cir. 1982).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  <u>See</u> <u>Celotex Corp v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  If that party bears the burden of proof at trial, it must affirmatively establish all elements of its legal claim.  <u>Southern Cal. Gas Co. v. City of Santa Ana</u>, 336 F.3d 885, 888 (9th Cir. 2003) (per curiam).  Otherwise, the moving party may satisfy its Rule 56(c) burden by "'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  <u>Celotex</u>, 477 U.S. at 325.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>Id.</u> at 322.

Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial.  <u>See id.</u> at 323-34; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).  A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of

material fact.  <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000).  Only genuine disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  <u>See</u> <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> <u>Aprin v. Santa Clara Valley Transp. Agency</u>, 261 F.3d 912, 919 (9th Cir. 2001) (the nonmoving party must identify specific evidence from which a reasonable jury could return a verdict in its favor).

When deciding whether a genuine issue of fact exists, the Court may not engage in credibility determinations or the weighing of evidence; such functions are the province of the jury, not the judge. <u>Anderson</u>, 477 U.S. at 255.

## C.  Evidentiary Objections

In support of their Motion for Summary Judgment, Defendants seek to introduce evidence of six audio recordings which purport to be recordings of the telephone calls that Mobrez made to Magedson on April 27, 2009 (two calls), May 5, 2009 (two calls), May 9, 2009 (one call), and May 12, 2009 (one call).  (Mobrez Depo., Exh. 25 [compact disc containing audio files of the recordings].)  Defendants seek to introduce these recordings to rebut the May 3, 2010 declarations that Plaintiffs Mobrez and Llaneras[8] filed with the Court in which they recounted the substance of their telephone conversations with Magedson in April and May 2009.[9]  Defendants contend that the recordings prove

---

[8] Llaneras never spoke with Magedson directly; however, she claimed in her May 3, 2010 declaration that she had listened to three calls between Mobrez and Magedson by picking up an additional phone receiver.

[9] At the April 19, 2010 status conference, the Court ordered Plaintiffs Mobrez and Llaneras, as well as Defendant Magedson, to file detailed declarations indicating every conversation between Plaintiffs and Defendants that Plaintiffs believed supported their claim that Defendants engaged in attempted extortion (as a predicate act to the RICO claims.)  Plaintiffs filed their declarations with the Court on May 3, 2010.  Magedson filed his declaration with the Court on May 11, 2010.

that the phone conversations were nothing like what was described in Plaintiffs' declarations, and that several of the statements Plaintiffs attributed to Magedson – for example, demands for money – simply never occurred.

Mobrez's phone records indicate that in April and May 2009, Mobrez called Magedson a total of seven times. (DSUF 46; Mobrez Depo., Exh. 21.)  One of these calls, on April 27, 2009, was not recorded. (DSUF 50.)   The remaining six calls were automatically recorded by a third-party vendor hired by Xcentric to record all telephone calls to Ripoff Report's main phone number. (Magedson Decl., dated May 24, 2010, ¶ 29.)  In April and May 2009, persons calling the Ripoff Report main telephone number were not given notice that their calls would be recorded.  (Mobrez Corrected Decl. ¶ 12; Borodkin Decl. ¶ 6, Exh. 3 [Magedson Depo.].)

Magedson testified that once a call is recorded, the third party vendor automatically emails Magedson an audio file which contains a copy of the recorded call. (Id. ¶ 29.) On April 20, 2010, Magedson reviewed the audio files of every recorded call made to the Ripoff Report's main telephone number over a period of several months – a total of 4,537 calls. (Id. ¶ 27.) Magedson declares that the six audio recordings submitted to the Court are true, complete, and unaltered copies of recordings automatically created by Xcentric's third party vendor. (Id. ¶¶ 25, 29.)

Plaintiffs contend that the recordings are inadmissible and cannot be considered on summary judgment.  Plaintiffs assert three primary objections to the recordings: First, Plaintiffs argue that California

Penal Code § 632(a)[10] prohibits a person from recording a confidential communication without the consent of all parties to the communication, and Section 632(d) makes such recordings inadmissible in both civil and criminal proceedings.  Second, Plaintiffs contend that the recordings should be excluded under Federal Rule of Civil Procedure 37(c) because Defendants failed to disclose the recordings in their initial disclosures.  Third, Plaintiffs contend that the recordings are inadmissible because they were not properly authenticated under Federal Rule of Evidence 902 and Defendants refused to disclose the name of the third party vendor to Plaintiffs.

### 1.   California Penal Code § 632

California Penal Code § 632(a) makes it a criminal offense to "intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrop[] upon or record[] the confidential communication . . . ."  Additionally, subsection (d) provides that no evidence obtained as a result of eavesdropping upon or recording a confidential communication shall be admissible in "any judicial, administrative, legislative, or other proceeding."  Cal. Penal Code § 632(d).  A confidential communication is defined as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto," but excludes communications that reasonably may be expected to be overheard or recorded.  Id.

Here, it is undisputed that Mobrez was unaware that his calls with Magedson were being recorded and that Mobrez did not give consent for

---

[10] Both parties repeatedly referred to California Penal Code § 623, which is wholly irrelevant to this case.  The relevant eavesdropping statute is California Penal Code § 632.

the recordings.  (Mobrez Corrected Decl. ¶ 12; Borodkin Decl. ¶ 6, Exh.

3 [Magedson Depo.].)  Thus, at the very least, some of the recordings

that Defendants seek to admit were obtained in violation of California

Penal Code § 632(a).[11]  Furthermore, even though the recordings complied

with the laws in the forum state in which the recordings were made

(Arizona), if the Court were to engage in a choice-of-law analysis

between Arizona and California law, the Court undoubtedly would apply

California law, given California's strong public interest in protecting

the confidentiality of certain communications.  See Downing v.

Abercrombie & Fitch, 265 F.3d 994, 1006 (9th Cir. 2001).  Nonetheless,

neither California Penal Code § 632 nor Arizona law is relevant to the

present action.

     The present action is based on federal law (as well as state law)

and is proceeding in federal court.  In such cases, "the Ninth Circuit

has consistently held that [recordings of conversations] [are]

admissible in federal court proceedings when obtained in conformance

with federal law and without regard to state law."  Roberts v.

Americable International, Inc., 883 F. Supp. 499, 503-04 (E.D. Cal.

1995) (citing United States v. Adams, 694 F.2d 200, 201-02 (9th Cir.

1982)); see Feldman v. Allstate Ins. Co., 322 F.3d 660 (9th Cir. 2003);

United States v. Cormier, 220 F.3d 1103, 1111 (9th Cir. 2000); United

States v. Little, 753 F.2d 1420, 1434 (9th Cir. 1984).  As the court

explained in Roberts:

          [Plaintiff's] argument has consistently been that his state
          law 'privacy privilege' [under California Penal Code § 632]
          has been invaded by [defendant's] actions.  However, as
          previously noted, this present action is based on federal law

---

[11] Voice mails would not fall within the prohibitions of California Penal Code
§ 632 because voice mails are necessarily recorded (and expected to be so) and
therefore do not constitute "confidential communications."  Two of the
recordings at issue are of voice mails that Mobrez left for Magedson.

> as well as state law.  It is well settled the federal law applies to privilege claims brought in actions based in whole or in part on federal law.

Id. at 504 (citing Pagano v. Oroville Hospital, 145 F.R.D. 683, 687 (E.D. Cal. 1993); Heathman v. U.S.D.C., 503 F.2d 1032, 1034 (9th Cir. 1974)).  Thus, Plaintiffs' motion to exclude the tape recordings must be examined under federal law.[12]

The Omnibus Crime Control and Safe Streets Act ("the Act") is the federal law that regulates the interception of oral communications.  18 U.S.C. §§ 2510 et. seq.  Section 2511(2)(d) provides that the interception of wire, oral, or electronic communications shall not be unlawful where the interception is done by a party to the conversation or where one of the parties to the conversation has given prior consent to such interception, unless the communication is intercepted for the purpose of committing any criminal or tortuous act.  18 U.S.C. § 2511(2)(d).  In the present case, Defendants Xcentric and Magedson clearly gave prior consent to the third party vendor to record all telephone calls coming into the main Ripoff Report telephone number.  Further, there is no evidence, nor any suggestion, that the purpose of the recordings was to perpetrate a criminal or tortuous act.  Although

---

[12] The result would be different if this case were proceeding on the ground of diversity jurisdiction.  In diversity cases, "a federal court must conform to state law to the extent mandated by the principles set forth in the seminal case of Erie R.R. v. Thompkins, 304 U.S. 64 (1938)."  Feldman v. Allstate Ins. Co., 322 F.3d 660, 666 (9th Cir. 2003).  "State evidence rules that are 'intimately bound up' with the state's substantive decision making must be given full effect by federal courts sitting in diversity."  Id.  The Ninth Circuit has concluded that California Penal Code § 632 embodies "a state substantive interest in the privacy of California citizens from exposure of their confidential communications by third parties," and therefore is "properly characterized as substantive law within the meaning of Erie" and must be applied in diversity cases.  Id. at 667.
Here, however, the Court has federal question jurisdiction.  Furthermore, Defendants are asking the Court to use the tapes as evidence to rebut the federal claims asserted by Plaintiff – i.e., the RICO causes of action.  Thus, as stated above, federal law relating to the interception of wire communications applies.

Plaintiffs allege that Defendants used the phone to communicate extortionate threats to Plaintiffs, even if that were true, there is no suggestion that *the recordings* were used for the purpose of extortion. To the contrary, Defendants have presented evidence that all calls to the Ripoff Report's main telephone number were recorded in the ordinary course of business.  Therefore, the recordings at issue do not violate federal law.

In sum, because the recordings at issue comply with federal law, they may be admitted as evidence without regard to California Penal Code § 632.

### 2.   Failure to Disclose Recordings in Initial Disclosures

Next, Plaintiffs argue that the Court should exclude the tape recordings under Federal Rule of Civil Procedure 37(c).  Rule 37(c) provides that "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Plaintiffs assert that Defendants failed to disclose the recordings in their initial disclosures on April 21, 2010, as required under Rule 26(a), even though Defendants knew of such tape recordings before April 21, 2010.  Instead, Defendants waited until May 7, 2010 to disclose the tape recordings at the deposition of Plaintiff Mobrez.

This argument also fails.  As Plaintiffs recognize in their briefs, Rule 26(a) does not require parties to disclose impeachment evidence in their initial disclosures.  Gribben v. United Parcel Service, Inc., 528 F.3d 1166, 1172 (9th Cir. 2008).  In the context of

1   the present motion, Defendants seek to introduce the tape recordings

2   only to impeach Plaintiffs' accounts of the conversations between

3   Mobrez and Magedson.  At a minimum, the recordings are admissible for

4   that limited purpose.

5           **3.   Inadmissible Under the Federal Rules of Evidence**

6        Plaintiffs' final objection is that the recordings were not

7   properly authenticated and are inadmissible under the Federal Rules of

8   Evidence 902 and 1002.  The Court agrees.  "When offered into evidence,

9   a tape recording must normally be accompanied by proof that the

10  recording is what it is purported to be."  ROBERT E. JONES, GERALD E. ROSEN,

11  WILLIAM E. WEGNER, AND JEFFREY S. JONES, RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL

12  TRIALS AND EVIDENCE § 8:472 (2009); Fed. R. Evid. 901(a).  The proponent of

13  the evidence must show that the tape is a "true, accurate, and

14  authentic recording of the conversation, at a given time, between the

15  parties involved."  United States v. Andreas, 23 F. Supp. 2d 835, 840

16  (N.D. Ill. 1998).   Courts generally consider the following

17  foundational factors when determining whether a tape recording is

18  admissible: (1) whether the recording device was capable of taking the

19  conversation; (2) whether the operator of the device was competent to

20  operate it; (3) whether the recording is authentic and correct; (4)

21  whether no change, additions or deletions have been made to the

22  recording; (5) whether the recording has been preserved in a manner

23  that is shown to the court; (6) whether the speakers are identified;

24  and (7) whether the conversation elicited was made voluntarily and in

25  good faith.   JONES & ROSEN ET AL., RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL

26  TRIALS AND EVIDENCE § 8:472.2 (citing United States v. Oslund, 453 F.3d

27  1048, 1057 (8th Cir. 2006), Penguin Books U.S.A., Inc. v. New Christian

28

1   <u>Church of Full Endeavor, Ltd.</u>, 262 F. Supp. 2d 251, 264 (S.D.N.Y.

2   2003)).

3       Here, Defendants offer the Declaration of Edward Magedson to

4   authenticate the recordings.  However, Magedson admittedly did not

5   record the conversations.  At best, Magedson can only state that the

6   recordings submitted to the Court are accurate copies of the audio

7   files that he was emailed by the third party vendor that actually made

8   the recordings.  (Magedson Decl., dated May 24, 2010, ¶¶ 25-29.)

9   Defendants have refused to reveal the name of the third party vendor to

10   the Plaintiffs despite the Plaintiffs' reasonable request (<u>see</u> Magedson

11   Depo. at pg. 74) and have not offered any declarations from the third

12   party vendor or any information about the method of recording, the

13   equipment used, or how the recordings are kept in the ordinary course

14   of the vendor's business.  Defendants have not produced the original

15   recordings to the Court or to the Plaintiffs.

16       Further, the foundational shortcomings are especially problematic

17   here because Plaintiffs have presented facts indicating that the

18   recordings may not be accurate or trustworthy.  Specifically, Mobrez's

19   phone records indicate the duration of each of the calls made from

20   Mobrez to Magedson in March and April 2009.  (Mobrez Depo., Exh. 21.)

21   In most instances, the duration of the calls is considerably longer

22   than the length of the recorded conversation submitted to the Court.

23   Thus, Plaintiffs suspect that the recordings may have been altered or

24   edited.  While Defendants have a ready explanation for the time

25   discrepancy – that is, that the third party vendor does not begin

26   recording the calls until after the caller has navigated through an

27   automated series of prompts, which takes some time – neither the Court

28

1 nor the Plaintiffs can verify this without testimony from the third
2 party vendor who actually recorded the conversations.  Finally,
3 Magedson's assertion that he did not personally alter or edit the
4 recordings does not resolve the issue,[13] as the recordings could have
5 been altered by the third party vendor.

6      For these reasons, the Court finds that the tape recordings have
7 not been properly authenticated and are not admissible as evidence in
8 support of Defendants' motion for summary judgment.

9      Nonetheless, this ruling does not change the landscape of the
10 summary judgment motion to any significant degree.  After the
11 recordings were revealed to Plaintiffs during the Mobrez deposition on
12 May 7, 2010, but before the summary judgment motion was filed, Mobrez
13 and Llaneras each filed declarations with the Court seeking to correct
14 their May 3, 2010 declarations.  In Mobrez's corrected declaration
15 filed on May 20, 2010, Mobrez admits that when he filed the May 3, 2010
16 declaration, he was "mistaken as to the substance of the six phone
17 conversations between [himself] and Magedson" and that he had "confused
18 some of what was said in [his] telephone conversations with what was
19 written in e-mail correspondence."  (Mobrez Corrected Decl. ¶¶ 2, 4.)
20 Similarly, in Llaneras's corrected declaration filed on May 20, 2010,
21 Llaneras states that "the descriptions of the telephone conversations
22 in my May 3, 2010 declaration were not accurate" and that she too "had
23 . . . confused some of what [she] overheard with some of what [she] had
24 read in emails."   (Llaneras ¶ 3.)  Thus, Mobrez and Llaneras now have
25 each admitted that their May 3, 2010 testimony regarding the phone

26
27 [13] This statement is not entirely accurate either, as Defendants admitted in
later briefing that the actual electronic files provided to Plaintiffs had
been redacted so as to exclude the name of the third party vendor in the file
28 titles.   (Defs. Response to Objections at 9.)

calls with Magedson is inaccurate and unreliable.  Additionally, Mobrez and Llaneras did not offer any additional description of what was said during the April and May 2009 phone calls in their corrected declarations, with one exception.  The corrected declarations each make some reference to Mobrez having a telephone conversation on an unspecified date with an unidentified person who mentioned "five grand" as the cost of joining the Corporate Advocacy Program.  (Mobrez Decl. ¶ 5; Llaneras Decl. ¶ 4.)

In sum, even excluding the recorded phone calls, the only evidence that the Court can consider regarding the communications between Plaintiffs and Defendants that are relevant to Plaintiffs' extortion claim are: (1) the emails between the parties; (2) the limited information contained in the Mobrez and Llaneras corrected declarations filed on May 20, 2010 – that is, information about the emails and about the call regarding "five grand;" and (3) Magedson's testimony regarding the substance of his calls with Mobrez, which is not refuted by Plaintiffs' corrected declarations.  For the reasons stated below, the Court finds that this evidence, even construing all reasonable inferences in support of Plaintiffs, fails to demonstrate a triable issue on Plaintiffs' RICO claims.[14]

**D.  Plaintiffs' RICO Claims**

Plaintiffs contend that Defendants were part of an enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), or alternatively, that Defendants conspired to violate the RICO statute under 18 U.S.C. § 1962(d).  To assert a RICO claim,

---

[14] Further, it is clear from Plaintiffs' Opposition that Plaintiffs are not relying on the substance of the phone calls to support their claims that Defendants engaged in attempted extortion.  Instead, Plaintiffs appear to rely solely on the emails Magedson sent to Mobrez and the content on Defendants' website.

28

Plaintiffs must prove the following elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity consisting of at least two predicate acts (5) causing injury to Plaintiffs' business or property.  <u>Chaset v. Fleer/Skybox Int'l</u>, 300 F.3d 1083, 1086 (9th Cir. 2002); <u>Gillmor v. Thomas</u>, 490 F.3d 791, 798 (10th Cir. 2007); see <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496 & n.14 (1985); 18 U.S.C. § 1961(5).  Section 1961 defines the predicate acts that constitute "racketeering activity" for purposes of the RICO statute.  Plaintiffs contend that Defendants committed the predicate acts of attempted extortion under California Penal Code §§ 518 and 523, and wire fraud under 18 U.S.C. § 1343.

In their motion for summary judgment, Defendants assert that Plaintiffs have not presented sufficient evidence to establish a triable issue of fact that Defendants engaged in the predicate act of extortion or attempted extortion.  For the reasons stated below, the Court agrees.

**1.   Extortion**

California Penal Code § 518 defines extortion as "the obtaining of property from another, with his consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, or under color of official right."  Cal. Penal Code § 518. Section 519 of the Penal Code defines "fear" as follows:

> Fear, such as will constitute extortion, may be induced by a threat, either:
>
> 1. To do an unlawful injury to the person or property of the individual threatened or of a third person; or,
>
> 2. To accuse the individual threatened, or any relative of his, or member of his family, of any crime; or,

3. *To expose, or to impute to him or them any deformity, disgrace or crime; or,*

4. *To expose any secret affecting him or them.*

Cal. Penal Code § 519 (emphasis added).  Under California Penal Code § 523, a person who attempts to commit extortion through the sending of any writing referencing an actionable threat as defined in Section 519 is guilty of extortion, notwithstanding the fact that the person did not actually obtain any money or property by means of the threat.  Cal. Penal Code § 523; Monex Deposit Co. v. Gilliam, 666 F. Supp. 2d 1135, 1136-37 (C.D. Cal. 2009).  Specifically, Section 523 provides:

> Every person who, with intent to extort any money or other property from another, sends or delivers to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat such as specified in Section 519, is punishable in the same manner as if such money or property were actually obtained by means of such threat.

Cal. Penal Code § 523.  In short, attempted extortion accomplished through means of a writing under Section 523 is actionable and constitutes a predicate act under RICO.  See Streck v. Peters, 855 F. Supp. 1156, 1163 (D. Hawai'i 1994) (definition of racketeering activity under 18 U.S.C. § 1961(1)(A) includes extortion or attempted extortion under state law).  Finally, although not relied upon by Plaintiffs here, California Penal Code § 524 criminalizes attempted extortion by means of a threat even where such threats are not made in writing. Cal. Penal Code § 524.

Plaintiffs contend that Defendants made two separate threats in writing in an attempt to extort money from Plaintiffs.  The first is "the implied threat that negative statements about the subject of a Ripoff Report will remain online and prominently featured in search

results unless the subject joins the Corporate Advocacy Program

("CAP")." (Opp'n at 9.) Thus, Plaintiffs contend that "Defendants'

solicitations to join CAP are part of the implied threat." (Id.)

Second, Plaintiffs contend that Defendants "threaten to counter-sue

anybody that sues them and that such litigants always lose and always

pay Defendants' attorneys fees." (Id.) In support of this latter

argument, Plaintiffs rely upon the standard email that Magedson sent to

Mobrez on May 5, 2009, which contains a warning to the effect that

suing the Ripoff Report would be a losing battle. The Court addresses

these arguments in reverse order.

### a. The Threat to Sue

As stated in the factual section above, on May 5, 2009, Magedson

sent Mobrez a standard "form" email which contained a warning about

suing the Ripoff Report. Specifically, the email reads: "To those of

you who threaten to sue, be prepared to go the long haul, and when you

want to do a walk away because you realize you cannot and will not win

because you filed a frivolous law suit, . . . you will be paying for

our legal bill and in some cases and then some, before we will let you

out of the case." (Mobrez Decl., dated May 3, 2010, Exh. G.) The

email also states that the Ripoff Report has been sued more than two

dozen times and has never lost a case. It goes on: "If you are

thinking of suing us, I hope you are personally prepared for this. We

are." (Id.) Finally, the email invites readers to "do a Google search

for Communications Decency Act" to understand why the Ripoff Report

often wins lawsuits against it. (Id.) In sum, the email indicates

that Ripoff Report has been sued in the past and has won, that Ripoff

Report will vigorously defend itself in any lawsuit, and that Ripoff
Report will seek attorneys' fees for frivolous suits filed against it.

The statements in the May 5, 2009 email are not actionable threats
within the meaning of Section 519.  First, Plaintiffs have not cited,
and the Court has not found, any authority holding that the threat to
*defend* oneself in a lawsuit brought by another constitutes extortion.
The closest analogy is to cases where the defendant threatens to bring
a civil or criminal action against the plaintiff if the plaintiff fails
to pay a certain sum.  Under California law, however, it is well-
settled that the threat to take legal action cannot constitute
extortion unless the threat was made with knowledge that the threatened
claim was false and without merit.  See Sosa v. DirecTV, Inc., 437 F.3d
923, 939-40 (9th Cir. 2006) (California's extortion statute does not
impose liability for threats of litigation unless the asserted claims
rise to the level of a sham); Furman v. California Satellite Sys., 179
Cal. App. 3d 408, 426 (Ct. App. 1986) ("to be actionable [in extortion]
the treat of prosecution must be made with knowledge of the falsity of
the claim"), *disapproved on other grounds by*, Silberg v. Anderson, 50
Cal. 3d. 205 (1990); Leeper v. Beltrami, 53 Cal. 2d 195, 204 (1959) (it
is generally true that the threat to take legal action cannot
constitute duress; the only exception is where, in making such threats,
defendants knew the claim asserted was false); In the Matter of Gladys
Nichols, 82 Cal. App. 73, 76 (Ct. App. 1927) (same).

Here, Plaintiffs have not introduced any evidence that Defendants'
"threats" to defend themselves in suits brought by others or to seek
attorneys' fees for frivolous suits launched against them were made
with knowledge of the falsity of such claims.  To the contrary, the

Court can take judicial notice of the fact that Defendants have, in
fact, been successful in numerous civil suits asserted against them in
connection with the Ripoff Report.  Further, various federal laws allow
for the payment of attorneys' fees as a sanction for asserting a
frivolous lawsuit.  See 28 U.S.C. § 1927; Fed. R. Civ. Proc. 11.  Thus,
the substance of the May 5, 2009 email does not allow for an inference
that Defendants knowingly threatened to bring a false claim against
Plaintiffs, and Plaintiffs have presented no other evidence in that
regard.  For this reason, Plaintiffs have failed to present any triable
issue of fact regarding Defendants' implied threat to sue.

Plaintiffs' argument fails for an additional, independent reason.
Even if the statements in the May 5, 2009 email constituted actionable
threats (which they do not), the statements are not connected with any
attempt to obtain money or property from Plaintiffs.  This is not a
case where the defendants threatened to sue the plaintiff unless the
plaintiff paid a certain sum or delivered property to defendants.  Cf.
Sosa, 437 F.3d at 926; Fuhrman, 179 Cal. App. 3d at 417; People v.
Umana, 138 Cal. App. 4th 625 (Ct. App. 2006).  To the contrary, nothing
in the May 5, 2009 email (or any other evidence submitted to the Court)
implies that Defendants will refrain from defending themselves in a
civil suit or will forego the right to any possible counterclaim in
exchange for money.  At most, the May 5, 2009 email is an attempt to
boast about Defendants' past legal successes and put the recipient on
notice that Defendants will vigorously defend themselves in any
lawsuits.  This does not constitute extortion within the meaning of
Sections 518, 519 or 523.  See Flately v. Mauro, 39 Cal. 4th 299,
(2006) ("rude, aggressive, or even belligerent pretrial negotiations,

1   whether verbal or written, that may include threats to file a lawsuit,

2   . . . [do not] necessarily constitute extortion.").

3              **b.   The Implied Threat Associated with the CAP Program**

4        Next, Plaintiffs contend that Defendants' "solicitations" to

5   Plaintiffs to join the CAP Program constitute an implied threat that

6   negative information about Plaintiffs will remain online and will be

7   featured in search results unless Plaintiffs pay the fees for the

8   program.  Plaintiffs contend that this constitutes a threat to "expose,

9   or to impute to [Plaintiffs] any deformity, disgrace or crime" or to

10  "expose a secret affecting [Plaintiffs]."  Cal. Penal Code § 519.

11       Plaintiffs' argument fails for several reasons.  First, there is

12  no evidence that Defendants ever threatened to impute to Plaintiffs any

13  disgrace or to expose a secret affecting Plaintiffs.  The negative

14  reports about Plaintiffs that appeared on the Ripoff Report website

15  did, in some instances, accuse Plaintiffs of crimes or impute to them a

16  disgrace.  But Plaintiffs have not presented any evidence that

17  Defendants wrote any of the negative comments or reports about

18  Plaintiffs or that Defendants contributed in any substantive way to the

19  negative content of those reports.  Similarly, Plaintiffs have not

20  presented any evidence that Defendants instructed or encouraged anyone

21  to write negative reports about Plaintiffs.  Finally, there is no

22  evidence that Defendants ever threatened that they would write or post

23  more negative information about Plaintiffs if Plaintiffs did not join

24  the CAP program.  Nothing even coming close to such a threat appears in

25  any of the emails to Plaintiffs.  In short, Defendants never threatened

26  to expose Plaintiffs; to the extent that Plaintiffs were exposed, such

27  exposure was done at the hands of the third parties who wrote the

28

34

negative reports, not Defendants.   See People v. Peniston, 242 Cal.
App. 2d 719, 722 (Ct. App. 1966) (to expose a plaintiff within the
meaning of Section 519(4), "the thing held secret must be unknown to
the general public, or to some particular part thereof which might be
interested in obtaining knowledge of the secret"); People v. Anderson
et al., 75 Cal. App. 365 (Ct. App. 1925), *disapproved on other grounds
by* In re Wright, 65 Cal. 2d 650 (1967).

Plaintiffs nonetheless argue that Defendants implicitly made a
threat of continued exposure – that is, that Defendants would allow the
negative information to remain on the website unless Plaintiffs joined
the CAP Program.   Even assuming (without any relevant authority) that
such a threat could be actionable under Section 519, there is no
evidence that Defendants made such a threat to Plaintiffs.   The Court
recognizes that, for purposes of extortion, "it is not necessary that
the threat be apparent from the face of the [writing], nor even
necessary that it should be implied therefrom. . . . [I]f the language
used is adapted to imply a threat, then the writing is sufficient."
See People v. Fox, 157 Cal. App. 2d 426 (1958).   Even under this
lenient standard, however, the communications from Defendants to
Plaintiffs do not suggest the threat of continued exposure unless
Plaintiffs join the CAP Program.   To emphasize this point, the Court
will examine both the phone conversations and the email communications
between the parties.

As to the phone conversations, it is undisputed that Mobrez and
Magedson spoke a number of times on the phone.   There is no evidence,
however, that the two ever discussed the substance of the CAP Program
or the fees associated therewith.   In fact, Magedson testified that as

a general policy, he never discusses the CAP Program over the phone
unless the person has already submitted an application to join the
program, which Mobrez never did.  Magedson testified that during his
conversations with Mobrez, he never asked Mobrez for money, never asked
him if his company was profitable or how it made money, and never told
Mobrez that the payment of a fee to Xcentric would result in negative
information being changed into a positive.  Mobrez does not dispute
these facts.  Moreover, there is no evidence that Magedson (or anyone
else) ever told Mobrez that Xcentric would remove or block negative
reports about Plaintiffs in exchange for a fee.

Mobrez's testimony that he remembers a phone call on some
unspecified date with some unspecified person in which $5,000 was
mentioned as the fees for the CAP Program does not create a triable
issue of fact.  This statement is not attributed to Defendants.
Moreover, this statement does not suggest or imply that payment of such
a fee will result in less exposure from the negative reports on the
website (or, alternatively, that failure to pay would result in more
exposure).

The email communications between the parties likewise do not
support Plaintiffs' position.  The emails contain some general
discussion of the CAP Program.  Notably absent from the emails,
however, is any statement or suggestion that joining the CAP Program
will result in negative reports being taken off the website or blocked
from publication.  In fact, the exact opposite is true.  Magedson's
emails to Mobrez repeatedly state that: "a Rip-off Report cannot be
taken off" (Mobrez Decl., Exh. G.); "WE DO NOT remove any Rip-off
Reports" (id.); for persons interested in joining the CAP Program,

"Reports are never deleted" (id.); "we do not remove a submitted Rip-off Report, and we never will.  Some people claim that we remove reports for money, but that is just plain false." (id.); "we DO NOT REMOVE REPORTS. . . . No amount of money can change this" (Mobrez Decl., Exh. K.)   These writings clearly state that membership in the CAP Program will **not** result in removal of the Ripoff Reports and that Defendants will not remove the reports for any fee.  Plaintiffs have not presented any evidence to the contrary.

Plaintiffs also rely upon two pages of the Ripoff Report website which were referenced in Magedson's emails by way of electronic links. The first page contains information about the benefits that CAP members receive by enrolling in the program.  (Mobrez Corrected Decl., Exh. M.) These benefits include: (1) the Ripoff Report will attempt to verify the truthfulness of the complaints submitted about the CAP member; (2) Ripoff Report will send a positive email to each complainant explaining that the company has joined the CAP program and has offered to negotiate to resolve the complaint; (3) Ripoff Report will include an update to each report indicating the CAP members' commitment to righting customer wrongs; and (4) the CAP Program gives the CAP member the opportunity to provide its side of the story and include a link to its website.  (Id.)  This webpage also includes some general information about the fees charged for the CAP Program.  (Id.)  The second webpage purportedly contains an application form for the CAP Program.  However, Plaintiffs have not produced a copy of this application form to the Court; thus, it is unclear what the form contains.  (See PSGI 25.)[15]

---

[15] Plaintiffs' description of contents of the CAP Application Form is not supported by any evidence and violates the best evidence rule.  Fed. R. Evid. 1002.

37

Once again, none of the web pages that Magedson referenced via electronic links in his emails to Plaintiffs contain any statements that membership in the CAP Program will result in negative reports being taken off the website or blocked from publication.  To the contrary, one of the webpages describes in some detail the features of the CAP Program.  The description does not contain any mention or suggestion that negative reports will be removed or blocked from the website.

In sum, none of the communications Defendants sent to Plaintiffs contain any suggestion that the CAP Program (or the payment of fees) would result in negative reports being taken off the website or that such reports would no longer be featured in search results.  Defendants clearly stated that negative reports are **never** taken off the website and that no amount of money would change this result; thus, it is absurd to contend that Defendants attempted to induce Plaintiffs to pay money to remove or block reports from the website.[16]  As far as the Court can tell, all of the communications directed to Plaintiffs describe the CAP Program as a public relations effort – that is, that the fees for the program are for Defendants' services in investigating the truth of the reports and acting as a liaison between the CAP member and the complainant to help resolve the dispute.  The offer to help Plaintiffs restore their reputation and facilitate resolution with the complainants in exchange for a fee does not constitute a threat under California Penal Code § 519.

---

[16] Plaintiffs also rely on email communications between Magedson and third parties, namely Tina Norris.  See PSGI 21, 26, 27, 28, 30, 32-38. Absent any evidence that Plaintiffs knew of these email communications in April and May 2009 when the alleged extortion took place, or that Defendants intended these email communications to reach Plaintiffs, they are not relevant to any alleged attempt by Defendants to induce Plaintiffs to pay money to Defendants by means of force or fear.

Finally, the one case cited by Plaintiffs in their Opposition, Monex Deposit Co. v. Gilliam, 680 F. Supp. 2d 1148, is easily distinguishable.  In Monex, the defendants created a website called www.MonexFRAUD.com which contained negative information about plaintiff, Monex Deposit Company.  See id. at 1159, 1160; Monex Deposit Co. v. Gilliam, No. SACV 09-00287-JVS (RNBx), 2009 WL 2870150, at *1 (C.D. Cal. 2009) (preliminary injunction ruling).  One defendant testified that he created the website because his "mission was to destroy Monex completely through a relentless marketing and awareness campaign."  680 F. Supp. 2d at 1159.  After creating the website, the defendants traveled to plaintiff's headquarters and delivered a letter with a demand and a "Plan of Action" to Monex employee Harvey Kochen.  Id. at 1156.  The letter and Plan of Action explicitly threatened to accuse and expose Monex of crimes.  Id. at 1157.  Specifically, the letter and Plan of Action stated that various governmental agencies and news outlets would be notified of criminal activities of Monex if Monex did not pay to settle claims "north of $20 million."  See id. at 1157, 1158.  Further, the letter referenced the considerable "damage done" to Monex by way of the website MonexFRAUD.com, id. at 1159, and warned Monex that more negative information would be posted to the website if the $20 million demand was not satisfied.  Id. at 1160.  Finally, at a meeting on March 19, 2009, defendants told a Monex employee that they would take down the www.MonexFRAUD.com website if Monex would pay them $20 million.  Id. at 1160.  On the basis of these facts, the Court granted summary judgment in Monex's favor on its extortion claims against the defendant creator of the website.  Id. at 1156-61.

The present case bears no resemblance to <u>Monex</u>. Unlike in <u>Monex</u>, the Plaintiffs here have not presented any evidence that Defendants created the negative reports about Plaintiffs on the RipoffReport.com website or solicited others to create reports about Plaintiffs. Further, unlike the defendants in <u>Monex</u>, here, there is no evidence that Defendants ever demanded money from Plaintiffs in exchange for the removal of negative reports. Indeed, there is no evidence that removal of reports was ever advertised as part of the CAP program. To the contrary – it is undisputed that Defendants repeatedly told Plaintiffs that reports are never removed from the website.

In sum, for the reasons stated above, the Court finds that no triable issue of fact exists as to whether Defendants engaged in attempted extortion. The communications between Plaintiffs and Defendants do not, as a matter of law, suggest or imply any threat within the meaning of California Penal Code § 519. Thus, summary judgment is GRANTED in Defendants' favor as to the third and fourth causes of action under RICO, to the extent those claims are based on alleged predicate acts of extortion.

**IV. PLAINTIFFS' RULE 56(f) REQUEST**

On Friday, July 9, 2010, one day prior to the summary judgment hearing, Plaintiffs filed an Ex Parte Application to deny or continue Defendants' motion for summary judgment so as to allow Plaintiffs to conduct further discovery under Federal Rule of Civil Procedure 56(f). Defendants oppose the request.

**A. Legal Standard**

Rule 56(f) provides that, "[i]f a party opposing the motion [for summary judgment] shows by affidavit that, for specified reasons, it

cannot present facts essential to justify its opposition," the court

may deny the motion for summary judgment or continue the hearing to

allow additional discovery or "issue any other just order."  Fed. R.

Evid. 56(f).  To obtain a Rule 56(f) continuance the opposing party

must "identify by affidavit the specific facts that further discovery

would reveal, and explain why those facts would preclude summary

judgment."  Tatum v. City & County of San Francisco, 441 F.3d 1090,

1101 (9th Cir. 2006).  The Ninth Circuit has held that Rule 56(f)

motions are generally favored so long as the opposing party makes (a) a

timely application (b) that specifically identifies (c) relevant

information, and (d) where there is some basis for believing that the

information sought actually exists.  Visa Int'l Service Ass'n v.

Bankcard Holders of America, 784 F.2d 1472, 1475 (9th Cir. 1986)

(reversing district court's denial of a Rule 56(f) continuance).

However, where the discovery sought is irrelevant and could not defeat

the motion for summary judgment or where the opposing party fails to

identify the specific facts such discovery will likely reveal, denial

of the motion is appropriate.  See, e.g., Tatum v. City and County of

San Francisco, 441 F.3d 1090, 1100 (9th Cir. 2006); Springs Window

Fashions LP v. Novo Indust., L.P., 323 F.3d 989, 998 (Fed. Cir. 2003);

United States v. Bob Stofer Oldsmobile-Cadillac, Inc., 766 F.2d 1147,

1152-53 (7th Cir. 1985).

   B.   Analysis

     As stated above, to justify a continuance under Rule 56(f),

the discovery sought must be "essential" to Plaintiffs' opposition.

Here, Plaintiffs concede that the additional discovery outlined in

their Rule 56(f) motion is not necessary to their opposition on summary

41

judgment.  Specifically, Plaintiffs argue: "Plaintiffs believe that
they have already submitted enough evidence opposing the MSJ showing a
genuine issue of fact for the August 3, 2010 trial." (Opp'n at 6.)
Nonetheless, "to avoid all doubt" and in an abundance of caution,
Plaintiffs sought a continuance to obtain the following evidence: (1) a
"Second Questionnaire" that Defendants sent to applicants of the CAP
program and a sample of the written agreement Defendants enter into
with CAP members; (2) deposition testimony from Defendants regarding
certain "impeachment evidence" that Plaintiffs recently identified; and
(3) a further deposition of Defendant Magedson.[17]  For the reasons
stated below, the Court holds that Plaintiffs have not met their burden
of demonstrating that this evidence would assist them in defeating
Defendants' motion for summary judgment as to the RICO/extortion
claims.

### 1.   Documents Regarding the CAP Program

First, Plaintiffs seek a copy of a "Second Questionnaire" and "CAP
Agreement" that were identified in Defendant Xcentric's Person Most
Knowledgeable deposition on June 2, 2010.  Magedson testified as the
person most knowledgeable of Xcentric on June 2, 2010.  In the course
of Plaintiffs' questioning about how persons are enrolled in the CAP
program, Magedson testified that, if a person expresses an interest in
joining the CAP program, he sends him or her a questionnaire that is
different from, and more detailed then, the questionnaire included on
the Ripoff Report website.  Magedson also testified that when a person
joins the program, the CAP member enters into a written contract with

---

[17] At the hearing on July 12, 2010, the Court confirmed with Plaintiffs' counsel that
these three subjects of discovery were the only bases for Plaintiffs' Rule 56(f)
Motion.

Xcentric – the "CAP Agreement."  Magedson testified that he has access to both the Second Questionnaire and the CAP Agreement and could produce them if directed to do so by his attorneys.  The documents have not been produced to Plaintiffs.

Plaintiffs contend that this evidence is necessary because, "the manner in which Defendants present the 'Second Questionnaire' to applicants for CAP and the extrinsic circumstances under which Defendants offer to enter into the CAP Agreements amount to attempted extortion under California law and a pattern of racketeering under the federal civil RICO statutes." (Ex Parte Application at 14.)  In response, Defendants argue that their motion for summary judgment does not challenge the absence of a "pattern" of racketeering activity for purposes of RICO.  Instead, Defendants' motion challenges Plaintiffs' standing to bring the RICO action – that is, whether <u>Plaintiffs</u> were ever the victims of alleged extortion attempts.  Defendants contend that "whether or not Defendants may have engaged in extortion or attempted extortion as to other non-parties does not cure the total lack of evidence showing that Plaintiffs were actually extorted." (Opp'n at 5.)

The Court agrees with Defendants.  Plaintiffs admitted at the July 12, 2010 hearing that the Second Questionnaire and the CAP Agreement were never sent to the Plaintiffs at any time and that they did not learn of such documents until after this lawsuit was filed.  Thus, while these documents may be relevant to the issue of "pattern", they cannot assist Plaintiffs in showing that a triable issue of fact exists as to whether Defendants attempted to extort money <u>from Plaintiffs</u> in 2009.  The situation might be different if there was a dispute as to

content of the communications between Plaintiffs and Defendants – for

example, if Plaintiffs testified that Defendants had sent them these

documents or presented the documents to Plaintiffs in connection with

threats or demands for money, and Defendants denied doing so, the fact

that Defendants sent these documents to others could be relevant.

But here, there is no material dispute regarding the written

communications Defendants sent to Plaintiffs; thus, the documents are

entirely irrelevant to whether Defendants intended to extort money from

Plaintiffs.

### 2.  Impeachment Evidence

Second, Plaintiffs seek testimony from Defendants under oath

regarding an email communication Plaintiffs recently learned of between

Defendants' General Counsel and a third party.  Specifically,

Plaintiffs contend that they recently were in contact with a third-

party witness named Jan Smith.  Smith emailed Plaintiffs' counsel a

copy of an email sent by Defendants' General Counsel, David Gingras, to

Smith regarding the removal of reports from the Ripoff Report website.

(Borodkin Decl., Exh. 32.)  In the email, dated January 15, 2010,

Gingras told Smith that in December of 2009, the Ripoff Report agreed

to remove a report on its website at the request of counsel for a 16-

year-old girl.  The girl's father had just died, and there was a very

embarrassing report about him on RipoffReport.com.  The girl shared her

father's unusual last name, and when persons searched for her, they

discovered the embarrassing report.  Gingras told Smith that Xcentric

took the report off the website "to help a 16 year-old girl during the

Christmas season" and "did not ask for or receive a dime" in exchange

for doing so.  (Id.)  Gingras also stated: "Of course, we can't really

44

advertise this because once we start saying that we're willing to help some people, it sort of opens the floodgates for everyone to demand the same treatment.  I know you'd like it if we would just take down anything/everything when asked, but that's just not something Ed is willing to do at this point.  Maybe someday, but not now." (Id.)

Plaintiffs contend that this evidence is relevant to Defendants' credibility because it impeaches Defendants' repeated prior statements to Plaintiffs (including sworn deposition testimony) that Defendants never remove or take down reports.  Plaintiffs seek further discovery regarding "Defendants' explanation for this apparent contradiction of Defendants' statements under oath."  (Ex Parte Application at 11.)  In response, Defendants contend that Plaintiffs have already obtained this evidence from a third party who is able to authenticate the document; thus, Plaintiffs do not need discovery from Defendants regarding this email.  Additionally, Defendants argue that "impeachment evidence" is wholly irrelevant for purposes of summary judgment because the Court is already obligated to draw every possible inference in favor of the non-moving party.  Finally, Defendants contend that Plaintiffs have not presented any argument as to why this evidence is relevant to the predicate act(s) of attempted extortion.

The Court agrees that Plaintiffs have failed to demonstrate how the Jan Smith email (and any testimony from Defendants related thereto) would assist them in defeating Defendants' motion.  The email, written to a third party over six months **after** the alleged extortion attempts, is entirely irrelevant to Plaintiffs' extortion claim.  As stated above, Plaintiffs' extortion theory is that Defendants made implicit threats to keep the negative reports about Plaintiffs on the website

45

1  unless they paid fees for the CAP Program.  The Jan Smith email,

2  however, makes no mention of the CAP Program.  Further, while the email

3  indicates that Defendants sometimes remove negative Ripoff Reports upon

4  request, the email expressly disavows that Defendants do so in exchange

5  for money.  Finally, and most importantly, communications to third

6  parties entirely unknown to Plaintiffs at the time of the alleged

7  extortion attempts cannot create a triable issue of fact that

8  Defendants attempted to extort money <u>from Plaintiffs</u>.

9            **3.   Further Deposition of Magedson**

10      Finally, Plaintiffs seek a further deposition of Defendant

11  Magedson for an additional 1.5 hours.  Magedson has already been

12  deposed in this action twice.  On June 2, 2010, Magedson was deposed as

13  the person most knowledgeable for Xcentric, LLC under Federal Rule of

14  Civil Procedure 30(b)(6).  (Borodkin Decl. In Support of Ex Parte

15  Request ¶ 23.)  The deposition lasted a full day.  Additionally,

16  Magedson was deposed in his personal capacity for approximately 5 1/2

17  hours on June 8, 2010.  (<u>Id.</u> ¶ 24.)  Plaintiffs suspended the

18  deposition due to "irreconcilable impasses regarding whether Defendant

19  Magedson would continue to testify without a protective order."  (<u>Id.</u>)

20  A protective order has since been entered by the Magistrate Judge

21  Walsh.  (June 24, 2010 Order, Docket No. 82.)

22      In June 2010, Plaintiffs made a motion to compel further

23  deposition testimony from Magedson.  Magistrate Judge Walsh heard the

24  motion to compel on June 24, 2010 and established a procedure for the

25  parties to follow regarding Magedson's deposition.  (Borodkin Decl. ¶

26  28.)  Specifically, Magistrate Judge Walsh required Plaintiffs to

27  submit a letter to Defendants regarding all of the questions that

28

46

Plaintiffs believed they still needed answers to.  (Id. ¶ 29.)
Defendants were then ordered to respond to Plaintiffs letter by July 1,
2010 indicating their position as to whether such questions had already
been answered or were otherwise objectionable.  (Id. ¶ 30.)  The
parties were to meet and confer regarding their positions and then set
up a telephone conference with Magistrate Judge Walsh during which he
would rule as to whether a further deposition was necessary.  (Id. ¶
29.)

The parties complied with the procedure set forth by Magistrate
Judge Walsh and were able to narrow their disputes down to three topics
upon which Plaintiffs contend they need further testimony.  At the time
of the summary judgment hearing, however, the parties had not yet
received a ruling from Magistrate Judge Walsh.  The three topics upon
which Plaintiffs seek further deposition testimony are: (1) The number
of persons enrolled in the CAP Program;  (2) whether Defendant Magedson
uses his cell phone to conduct Xcentric business, and specifically
whether he uses his cell phone to discuss enrollment in the CAP Program
with third parties; and (3) testimony about whether any positive
material is ever posted on the Ripoff Report website other than
rebuttals and the introductory comments that Defendants post about CAP
members.

Plaintiffs have not offered any explanation as to why this
discovery is relevant to Defendants' summary judgment motion, and the
Court can find none.  First, as to the number of persons enrolled in
the CAP Program, the only possible relevance of this fact is that,
assuming the CAP Program is part of an extortion scheme, the evidence
could show the requisite "pattern" of activities under RICO.  Even

assuming Plaintiffs can establish a pattern, however, Plaintiffs have not raised a triable issue of fact as to whether they were the targets of any alleged extortion attempts.  In other words, whether there are 2 members of the CAP Program or 200 members, Plaintiffs' claims nonetheless fail because there is no evidence that Defendants ever communicated any actionable threats to Plaintiffs.  See United States v. Bob Stofer Oldsmobile-Cadillac, Inc., 766 F.2d 1147, 1152-53 (7th Cir. 1985) (denying a Rule 56(f) motion seeking discovery as to defendants' intent where, even had plaintiffs proven defendants' intent, another essential element of their claim would have failed and summary judgment would still be granted in defendants' favor).  Thus, this evidence cannot assist Plaintiffs in overcoming summary judgment.

Likewise, whether Magedson used his cell phone to solicit customers for the CAP Program is not relevant to whether Plaintiffs were the victims of extortion.  Plaintiffs have not presented any evidence that Magedson ever called Plaintiffs on his cell phone or otherwise.  Further, Plaintiffs would have been parties to any conversations between themselves and Magedson, and therefore would be able to recount the substance of any conversations with Magedson without needing testimony from Magedson.  Plaintiffs have already submitted two rounds of declarations regarding their conversations with Magedson and have not presented even a scintilla of evidence of actionable threats.  There is no indication that further testimony from Magedson would help them in that regard.  Finally, to the extent that Plaintiffs are attempting to learn about conversations between Magedson and other third parties, those conversations are not relevant to Defendants' alleged attempts to extort money from Plaintiffs.

Lastly, as to the positive information posted on the Ripoff Report website, the Court cannot find any rational relation between this evidence and the current summary judgment motion.  Defendants have already provided testimony about the benefits of the CAP Program, including the positive introduction that is added to the reports about CAP members.  Whether Defendants or third parties posted other positive information, and under what circumstances, bears no relationship to any alleged threats under California Penal Code § 519.

For these reasons, Plaintiffs' Motion for a Continuance Under Rule 56(f) is DENIED.

## V.   DEFENDANTS' MOTION TO DISMISS

In support of their RICO claims, Plaintiffs also alleged in their Complaint that Defendants engaged in predicate acts of wire fraud under 18 U.S.C. § 1343.[18]  Defendants did not challenge the wire fraud predicates in their motion for summary judgment; however, Defendants argued in their reply brief that the allegations in the Complaint were manifestly insufficient to state a claim for wire fraud as a predicate act for RICO.  Additionally, at the motion hearing on July 12, 2010, Defendants made an oral motion to dismiss the RICO claims based on the predicate acts of wire fraud, arguing that the allegations were patently deficient under Federal Rule of Civil Procedure 9(b).  Having carefully reviewed Plaintiffs' Complaint, the Court agrees that the pleadings are insufficient to state a claim for RICO violations based on wire fraud.

The wire fraud statute makes it a crime for any person "having

---

[18] Plaintiffs actually cited the mail fraud statute, 18 U.S.C. § 1341, in their Complaint.  However, Plaintiffs make clear in their Opposition (see pg. 12) that they intended to allege claims of wire fraud.  Indeed, there is no evidence that the Defendants ever communicated with Plaintiffs through the U.S. Mail; instead, all relevant communications occurred over the Internet.

devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate commerce, "any writings, signs, signals, pictures, or sounds for the purposes of executing such scheme or artifice . . ." 18 U.S.C. § 1343.  To state a claim for wire fraud, the Plaintiffs must show: (1) a scheme to defraud, (2) use of interstate wires in furtherance of that fraud, and (3) specific intent to defraud.  <u>Comwest, Inc. v. American Operator Services, Inc.</u>, 765 F. Supp. 1467, 1476 (C.D. Cal. 1991) (citing <u>Sun Savings & Loan Association v. Dierdorff</u>, 825 F.2d 187, 195 (9th Cir. 1987)).

     "Under Ninth Circuit law, RICO claims based on predicate acts of . . . wire fraud must be dismissed where the alleged predicate acts fail to state a claim for violation of the . . . wire fraud statute[]." <u>Id.</u> (citing <u>Alan Neuman Prods., Inc. v. Albright</u>, 862 F.2d 1388, 1392 (9th Cir. 1987) (dismissing RICO claims because predicate acts of mail and wire fraud were not plead with specificity as required by Rule 9(b)).  As a species of fraud, claims of wire fraud are subject to the heightened pleading requirements of Rule 9(b).  <u>Id.</u>; <u>see Desoto v. Condon</u>, No. 08-56832, 2010 WL 1141521, at *1 (9th Cir., Mar. 24, 2010).  Thus, to withstand a motion to dismiss, the plaintiff must allege "'the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation.'" <u>Desoto</u>, at *1 (quoting <u>Schreiber Distr. Co. v. Serv-Well Furniture Co.</u>, 806 F.2d 1393, 1401 (9th Cir. 1986)); <u>Comwest, Inc.</u>, 765 F. Supp. at 1466.

Plaintiffs' Complaint woefully fails to meet these requirements. Plaintiffs' entire Complaint contains a single conclusory allegation regarding the wire fraud predicates, to wit: "The overall scheme and design of the websites as a means to extort money from companies such as Plaintiffs and the fraudulent claims made in furtherance of that scheme constitute violations of 18 U.S.C. § 1341,[19] particularly here where all of the communications are made over the Internet." (Compl. ¶ 66.)  The Complaint does not contain any factual allegations regarding the alleged false representations Defendants made to Plaintiffs - including who made the misrepresentations, when and to whom they were made, and what was said - nor does the Complaint allege any facts as to how those misrepresentations (whatever they may be) were part of a scheme to defraud Plaintiffs.  For these reasons, Plaintiffs' Complaint is manifestly insufficient under Federal Rule of Civil Procedure 9(b).

As the Court has granted summary judgment in Defendants' favor as to the alleged predicate acts of extortion, without the predicate acts of wire fraud, Plaintiffs cannot state a claim under RICO.  See Comwest, Inc., 765 F. Supp. at 1476.  Thus, Defendants' motion to dismiss Plaintiffs' third and fourth causes of action under RICO is GRANTED WITH LEAVE TO AMEND.  Plaintiffs shall have until July 27, 2010 to amend the Complaint.  If Plaintiffs do not intend to amend the Complaint so as to re-plead the RICO claims, Plaintiffs shall so notify the Court no later than July 27, 2010.

**VI.   PLAINTIFFS' MOTION FOR A BENCH TRIAL**

On May 31, 2010, Plaintiffs made a motion for a bench trial and to

---

[19] As stated above, this citation appears to be in error.  Plaintiffs intended to cite the wire fraud statute, 18 U.S.C. § 1343.

1   enforce Defendants' waiver of their right to a jury trial.   Defendants

2   did not oppose the motion.   Thus, pursuant to Local Rule 7-12, the

3   Court deems Defendants' failure to oppose the motion as consent to the

4   granting of the motion.

5       Additionally, Defendants have not demanded a jury trial in

6   accordance with Federal Rule of Civil Procedure 38(b).   Rule 38(b)

7   requires that a party serve a written demand for a jury trial (which

8   may be included in a pleading) no later than 14 days after the last

9   pleading directed to the issue is served, or that a party file a demand

10  with the Court in accordance with Rule 5(d).   Defendants did not take

11  either of these steps.   Further, although this case was removed from

12  state court, see Fed. R. Civ. Proc. 81(c)(3)(A), Defendants have also

13  waived their right to a jury trial under state law.   California law

14  provides that a litigant waives a jury trial by failing to announce

15  that a jury is required at the time the case is first set for trial.

16  Cal. Code Civ. Proc. § 631(d).   The Court set the matter for trial at

17  the initial case status conference on April 19, 2010.   Defendants did

18  not demand a jury trial at that time.   Thus, Defendants' right to a

19  jury trial has been waived.

20      For these reasons, Plaintiffs' Motion for a Bench Trial is

21  GRANTED.

22  **VII. CONCLUSION**

23      For the reasons stated above, the Court rules as follows:

24  Defendants' Motion for Summary Judgment is GRANTED IN PART as to

25  Plaintiffs' third and fourth causes of action under RICO to the extent

26  those claims are based on the alleged predicate acts of extortion or

27  attempted extortion.   Defendants' Motion for Summary Judgment is DENIED

28

as to Plaintiffs' remaining claims arising under state law and as to
Plaintiffs' alleged damages.  The denial is without prejudice to
Defendants asserting such arguments in a future summary judgment motion
when those claims are properly before the Court.

Plaintiffs' Ex Parte Request for a Continuance of the Defendants'
Summary Judgment Motion is DENIED.

Defendants' Motion to Dismiss Plaintiffs' third and fourth causes
of action under RICO for failing to plead the alleged predicate acts of
wire fraud with particularity is GRANTED WITH LEAVE TO AMEND.
Plaintiffs shall file any amended complaint no later than July 27,
2010.  Thereafter, Defendants are granted until Friday, August 6, 2010
to file a motion to dismiss the amended complaint, if they believe such
a motion is warranted.

Plaintiffs' Motion for a Bench Trial is GRANTED.

The case remains bifurcated as to the RICO claims only.  If
Plaintiffs decide to amend the complaint so as to re-plead the
predicate acts of wire fraud, the Court will revisit the issue of
further discovery (including the continued deposition of Magedson)
after any motions to dismiss are resolved or the time for filing such
motions has expired.

IT IS SO ORDERED.

DATED:    07/19/10

STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE

53